Pee Curiam :
This case was referred to Trial Commissioner Herbert N. Maletz, with directions to make recommendation .for conclusions of law on plaintiff’s motion and defendant’s cross-motion for summary judgment.* The commissioner has done so in a report and opinion filed November 2, 1965. Defendant sought review of the commissioner’s opinion and recommendation for conclusions of law pursuant to Buie 55(b) (3), briefs were filed by the parties, and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff’s motion for summary judgment is granted, defendant’s cross-motion for summary judgment is denied and judgment is entered for *429 plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).
Commissioner Maletz’ opinion, as modified by the court, is as follows:
This suit arises out of a contract for the production of 230 electronic interrogator sets which are used by the Air Force to distinguish friendly aircraft from unfriendly ones. The contract required that each of the sets be subjected to bounce conditioning; however, this requirement was omitted from the first 135 sets produced. The Government, nevertheless, accepted all these sets but at a later date the contracting officer directed that the remaining 95 sets be bounce conditioned. Plaintiff complied and then sought a change order to provide for an equitable adjustment. His request was denied by the contracting officer, whose decision was sustained on appeal by the Armed Services Board of Contract Appeals (ASBCA). Plaintiff then brought the present suit and seeks, via summary judgment motion, judicial review of that determination on the basis of the administrative record before the Board, to which defendant has countered by a cross-motion for summary judgment.[1]
The facts as disclosed by the administrative record are these: Plaintiff was awarded a contract in May 1957 by the Army Signal Supply Agency which, as modified in the following month, called for the manufacture of 230 interrogator sets at a unit price of $3,050 and a total price of $701,500. The sets were to conform to specification MIL-I-10536A, section 3 of which, entitled “Requirements”, contained the following paragraph:
3.12 Bounce conditioning. — After final assembly, each component on contract, with shock mounts removed or blocked, shall be placed in its normal operating position on the table of the Package Tester as made by the L.A.B. Corporation, Summit, New Jersey or equal. The package tester, shafts in phase, shall have a speed such *430 that it is just possible to insert a %2-inch-thick strip of material under one corner or edge of the equipment to a distance of 3 inches as the equipment bounces. The equipment shall be subjected to this conditioning for 1 minute. After conditioning the equipment shall be capable of meeting the inspection of section 4.
Section 4 of the specification entitled “Sampling, Inspection and Test Procedures” included the following paragraph:
4.19 Visual and mechanical inspection. — Parts and equipment shall be inspected for workmanship, mechanical fit, loose nuts, and screws, application of specified tropicalization treatments, and miscellaneous defects. Controls and fastening devices shall be inspected for mechanical operation. Wiring, soldered connection, ground connections, welds, finishes, etc., shall be inspected for workmanship. Clearances, dimensions, and mechanical adjustments shall be measured. Labels and markings shall be inspected for conformance with approved facsimiles, when facsimiles are required. Examination also may be made for other visual or mechanical defects, similar to those described above, that are contrary to specified requirements for the equipment. Visual and mechanical defects shall be classified by the Government inspector as major or minor in accordance with the definitions of Standard MIL-43TD-105.[2]
The purpose of the paragraph 3.12 bounce conditioning requirement was to shake out loose bits of wire and solder that may have been in the assembly and to disconnect any loose connections so that they would show up in the electrical tests that were to immediately follow. In essence, the bounce conditioning preconditioned the set for the electrical testing. The one minute of bounce conditioning was not a costly operation and the bounce table equipment that was required cost only $800.00 new and could be rented for much less. *431 Plaintiff did not, however, have a bounce table when it began performance of the contract.
Pursuant to contractual requirements, plaintiff in June 1958 submitted to the Government a proposed list of electrical production tests to be conducted on all interrogator sets during normal production, which list, in accordance with customary procedure, did not contain all the tests set out in the contract and the specifications. No reference was made in this list to bounce conditioning. In July 1958 the Government approved plaintiff’s proposed list subject to the addition of the “Visual and Mechanical Inspection Test” of paragraph 4.19 and the addition of three antenna tests that were not specifically required by the contract since the contract as awarded called for an antenna without providing for any tests therefor.
Section 31 of the contract contained a special provision designating contracting officer’s representatives and read in part as follows:
DESIGNATION OF REPRESENTATIVES: The Contracting Officer designates the representatives specified below to approve changes which are in the best interest of the Government, provided such changes will not affect quality, quantity, price, or delivery schedule. Any changes affecting quality, quantity, price, or delivery schedule shall be submitted to and subject to the written approval of the Contracting Officer. * * *
(a) Quality Assurance Activity:
(1) The Chief of the Quality Assurance Activity designated in this contract, or the chief of any other activity to whom inspection responsibility is delegated, or their designated representative, may approve changes on those matters which pertain to the inspection and testing of supplies. These matters include, but are not limited to establishment of Government inspection systems, determination of the type and amount of Government inspection to be performed, and interpretation of specification requirements.
(2) The Signal Corps Quality Assurance Activity designated in this contract is * * * authorized to introduce technical and engineering changes.
In August 1958, plaintiff’s two preproduction samples were submitted and approved. Before production could begin, *432 however, the Government established an Initial Production Phase, the objective of which is to establish production procedures to be used during a contract. Thus, on August 29’, 1958, the Chief of the U.S. Army Signal Supply Agency’s Quality Assurance Operations Division[3] notified plaintiff by letter as follows:
An Initial Production Phase for the above referenced order is hereby established for the first 50 units of production. During this period, Mr. Frank Mead, Field Engineer of the Field Engineering Division, U.S. Army Signal Equipment Support Agency, will assume responsibilities for authorizing deviations, modifications and other engineering changes in specifications provided the changes do not affect price or delivery.
By letter dated September 15, 1958, plaintiff protested that the Initial Production Phase was an added requirement that would cause delays and added costs for which it should get a price increase. The contracting officer replied by letter dated December 4,1958, that he did not feel the Initial Production Phase would cause delays or interrupt production, but that it would assist the contractor and the Government in the performance of the contract by the establishment of realistic limits when required, and other clarifications which might be necessary. He added that it was not the purpose of the Initial Production Phase to make any changes in the contract terms.
In or about December 1958, Mead, the Government’s field engineer, reported to plaintiff’s plant and stayed there for some 30 days until the first 50 units were produced. Upon arriving at the plant, he learned that a 'bounce conditioning-table was not available at the plant and thereupon “initiated an increased supervision of the procedure” to accomplish visually by thorough inspection the same function bounce conditioning would have fulfilled. Plaintiff produced the first 50 units without bounce conditioning in accordance with these production procedures and all such units were accepted as complying with the contract requirements by the resident Government inspector who knew they had not been bounce *433 conditioned. Thereafter, plaintiff continued the production of the sets in accordance with the same procedures and standards that were established in the Initial Production Phase and manufactured an additional 85 sets without bounce conditioning, all of which were likewise accepted by the resident Government inspector with full knowledge that bounce conditioning had not been performed. The Government has never contended nor was there ever any indication that the first 135 units produced without bounce conditioning were defective in any respect or inferior in any way to the units produced after bounce conditioning was performed. Further, as found by the Board, the record warrants the conclusion that plaintiff did not realize any over-all saving on account of the omission of bounce conditioning.
Some time in August 1959, after production and acceptance of the first 135 sets, Melvin Lucas, an electronic specialist employed by the Signal Corps Supply Agency as an advisor to the Deputy Quality Assurance Inspector, visited plaintiff’s plant and seeing no bounce table there was informed by the resident Government inspector that the one-minute bounce conditioning operation had been omitted. Lucas asked whether there had been any written-waiver of this military specification provision and upon learning there was not, concluded that plaintiff was not complying with the contract. In reaching this conclusion, Lucas was unaware of what had transpired in the Initial Production Phase; he did not contact Mead; and he did not know that Mead had allowed substitution of augmented visual inspection for bounce conditioning. Lucas reported his conclusion to the contracting officer who telegraphed the resident Government inspector and instructed him not to accept any more units unless they were bounce conditioned. Plaintiff protested this directive by letters dated October 9, 1959 and October 19, 1959, stating (i) that the Signal Corps had approved the test procedures that were followed, and (ii) that the production procedures approved by Mead constituted an agreement to omit bounce conditioning. Plaintiff asserted also that if it were required to institute bounce conditioning at that stage, it would take 60 to 90 days to obtain a bounce table, with the result that it would have to *434 shut down tbe production line for this period and lay off a substantial number of personnel. In these circumstances, plaintiff made a request — with which the resident Government inspector concurred — that the contracting officer lift immediately the ban on future shipments and waive bounce conditioning for the remaining 95 units. The contracting officer refused to modify his directive and plaintiff was compelled to yield. Plaintiff eventually was able to rent a bounce table for $80.00 a month, following which it completed production of the remaining 95 units. It then filed a claim under the contract’s “changes” clause for an equitable adjustment for delay costs, asserting that its production line was shut down and personnel were laid off until the bounce table could be obtained and that this caused a delay of about three months. The claim was denied on the merits by the contracting officer and a timely appeal to the ASBCA followed.
A hearing was originally scheduled before the Board on January 5, 1961. However, at the opening of the hearing, the presiding Board member indicated that there did not appear to be any material issue of fact that would warrant the taking of testimony, whereupon counsel for the parties agreed to a decision on the basis of the pleadings, appeal file and briefs. Subsequently, the Board issued a decision dismissing the appeal on the ground that plaintiff had failed to prove that the parties had agreed that the bounce conditioning provision would not be applied. Plaintiff filed a motion for reconsideration and hearing which was granted and a full hearing with testimony by witnesses was held by the Board, which by a 2-1 vote reaffirmed its previous decision denying the appeal.[4] The Board construed paragraph 3.12 of the specification as a production process requirement and not a test requirement on the ground that it appeared in the specification’s requirements section and not in its inspection and testing section. Since bounce conditioning was thus considered to be a production and not a test requirement, the Board concluded that the fact that it was not included in plaintiff’s proposed test list which was approved by the Gov- *435 eminent did not constitute evidence of an agreement to eliminate the requirement. In addition, the Board held that the testimony failed to establish a binding agreement to eliminate bounce conditioning, stating:
* * * [T]he testimony of the witnesses fails to establish an agreement between the parties of the type relied upon by appellant. It is testimony of one Government representative, concerning his conversations with another Government representative, after he learned that appellant did not have a machine upon which to bounce condition the components. Seeking to avoid a delay (an apparently inexcusable delay) he waived these requirements. His testimony is more descriptive of an act of forbearance, than of an agreement with appellant based on a valuable consideration. Appellant’s personnel did not even participate in these discussions. They were, in short, internal Government arrangements with respect to quality control.
Turning to the argument that the antenna tests and initial production phase constituted consideration for elimination of bounce conditioning, there is nothing in the record to demonstrate any relationship whatever between these items and bounce conditioning. We express no opinion on whether the antenna tests or initial production phase constituted extra work for which appellant would be entitled to a price increase. This is not before us. Suffice it to say that there is nothing in the record to support the argument that performance of these items constituted consideration for elimination, by agreement, of the bounce conditioning requirement.
Finding no valid and binding prior agreement eliminating the bounce conditioning requirement, we find that its imposition did not constitute a change within the contemplation of the “Changes” article, and our original opinion denying the appeal is reaffirmed.[5]
Plaintiff says that the Board’s conclusion that the evidence did not establish the existence of a valid and binding agreement is a legal conclusion not entitled to finality and that to *436 the extent it constitutes a question of fact, it is arbitrary and capricious and not supported by substantial evidence. It contends (1) that bounce conditioning is a test and that the Government by approving its list of test procedures agreed to the substitution of the visual and mechanical inspection requirements, of paragraph 4.19 for the paragraph 3.12 bounce conditioning requirements; (2) that there was an agreement between plaintiff and a duly authorized Government representative to substitute augmented visual and mechanical inspection for bounce conditioning; (3) that even if there had not been such an express oral agreement, the production procedures established in the Initial Production Phase constituted agreed upon modifications to the contract requirements; (4) that the actions of the parties prior to the commencement of the controversy established the existence of an agreement to omit bounce conditioning; and (5) that in any event the Government is estopped from invoking the requirement for bounce conditioning. 'Defendant contends (1) that bounce conditioning was a production requirement and not a test; (2) that there was no agreement to waive the bounce conditioning; and (3) that the Government’s acceptance of 135 sets did not waive its right to have bounce conditioning performed.
For the reasons stated below, it is concluded (a) that the Board’s decision is not supported by substantial evidence, and (b) that the record establishes the existence of a valid agreement between plaintiff and a duly authorized Government representative to omit bounce conditioning and accomplish the same function by increased visual and mechanical inspection.[6]
That there was an agreement between the parties to substitute augmented visual and mechanical inspection procedures for bounce conditioning is shown by the undisputed testimony before the Board of Mead, the Government’s field engineer, and Clifford A. Harvey, plaintiff’s vice president. Mead testified that he was aware of plaintiff’s lack of a bounce conditioning table at the time of the Initial Production Phase; that he had discussions about this with the resi *437 dent inspector as a result of which he “agreed” to the omission of bounce conditioning subject to increased and more rigid visual and mechanical inspection procedures during the Initial Production Phase; that such procedures accomplished a result comparable to what would have been obtained by bounce conditioning; and that he was authorized to provide that performance would be accomplished and accepted in this fashion.[7] Specifically, Mead testified as follows:
A. Sir, we have [sic] discussions concerning bounce conditioning.
Q. What were those discussions ?
A. These discussions occurred shortly after my arrival at the time when the production was pretty much in process. My orders when I went up from Fort Monmouth were to get the stuff going out because they were behind schedule and we needed to get the thing straightened out.
When I went up there, Mr. Wright [the resident government inspector] and I discussed this but not to any great extent, but to the point where it was solved satisfactorily, at least, in my mind, and the end result being that inasmuch as a bounce conditioning table was not available at the Harvey-Wells plant and that the function of the bounce conditioning process was, as Mr. Lucas described, to remove blobs of solder and foreign matter from the interior of the chassis and to point up any poorly fastened electrical devices, we initiated an increased supervision of the procedure, if we may use the term, to show that — to make sure that the chassis and subchassis themselves were clean, very clean, and that the parts were inspected to be sure that all electrical devices were indeed securely fastened down.
This was done because no bounce conditioning package tester was available.
Q. As a result of these discussions were Mr. Wright and yourself aware of the circumstances under which performance was being made and you agreed that, if this procedure that was evidently established for this careful supervision, that all loose items and material in the equipments was removed and that all of the other parts were bolted down securely and locked in, then you were satisfied that the item met the requirements of the contract ?
*438 A. Yes, sir.
Q. Those are the requirements that you state existed and had to be followed in order to bring about the same result, comparable with the results from bounce conditioning, which was required under paragraph 4.19 ?_
A. No, sir. Section 4 has to do with tests and this is not a test.
Q. So then, as I understand your testimony, you established a procedure or practice that required the appellant to do certain things which brought about a result that was comparable to what would be brought about had there been a bounce conditioning table available ?
A. I did have Mr. Wright check very minutely every stage of manufacture of the assembly and of the small chassis components of the assembly up until the completed unit and this he did.
Q. You were authorized, were you not, to provide that performance would be made and accepted in that fashion?
A. I was given this authority, yes, sir.
Harvey, plaintiff’s vice president, testified at a prior stage of the hearing, and without contradiction, that “it was agreed between our engineering people, Mr. Mead and the Air Force resident inspector that an inspection process had been substituted in lieu of the bounce conditioning test.” Tr. 21. See also Tr. pp. 63,69-70. His testimony established the context for Mead’s testimony and made clear that plaintiff was party to the agreement and that the agreement was one between plaintiff, Mead and the resident inspector. In these circumstances, the Board’s interpretation of Mead’s testimony as referring to an internal agreement between him and the resident inspector ignored the prior testimony of Harvey which provided the predicate for Mead’s testimony. It also ignored the fact that the Government offered no testimony or other evidence to contradict the existence of an agreement between plaintiff and Government representatives.
Additional evidence of the existence of an agreement rather than of an act of forbearance was provided by the action of the parties during performance.[8] The situation, as *439 disclosed by the record, was not one in which Mead, when he arrived at the plant during the Initial Production Phase, permitted omission of bounce conditioning only until plaintiff secured the necessary bounce table equipment. The situation, rather, was one in which Mead, with full awareness of the lack of bounce table equipment, established production procedures in the Initial Production Phase omitting the bounce conditioning requirement and substituting therefor augmented inspection, which production procedures were designed to be applicable to performance of the entire contract. More particularly, the record makes clear that the purpose of the Initial Production Phase or pilot run was to set up standards and procedures to govern performance throughout the contract. Beyond this, Mead testified: “I told Mr. Wright ;[the resident inspector] that everything appeared to be going all right and if he continued to test considering the standards which I had set up during my pilot run, things looked as though they would be all right, but I was available in the event anything else came up.” It was in this setting that 135 units were accepted by the resident inspector with full knowledge that they had not been bounce conditioned. Thus, the omission of bounce conditioning was not some technical deviation only discovered after performance was 60 per cent complete; it was a deliberate modification of production procedures made with the full knowledge and consent of both parties, and one on which plaintiff was entitled to rely.
Nor was the agreement to omit bounce conditioning gratuitous. On the contrary, both sides obtained a benefit. The plaintiff received the benefit of not having to acquire or rent a bounce table and of being allowed to omit the one-minute bounce conditioning operation, while the Government received the benefit of augmented visual and mechanical inspection procedures initiated by Mead that were more rigid than originally contemplated under the contract. Further, there can be no doubt that Mead was authorized to enter into the agreement. As the Government field engineer assigned to conduct the Initial Production Phase, Mead’s specific function, through delegation, was to agree upon acceptable production procedures and he was authorized to make changes in the con *440 tract requirements to accomplish this function so long as the changes did not affect price or quality — which was the case here.[9] For the record establishes that the substitution of the visual and mechanical inspection operation for bounce conditioning had no effect on the quality of the units, on the contract price, the quantity or the delivery schedule.
Plaintiff’s motion for summary judgment to recover for breach of contract should be granted; defendant’s cross-motion denied; and judgment entered for plaintiff, with the amount of recovery to be determined pursuant to rule 47 (c).

The opinion and recommended conclusion of law of the trial commissioner was submitted pursuant to order of the court under Rule 54(b). The facts are stated in the opinion.

 Plaintiff seeks recovery here for breach of contract rather than an equitable adjustment for the reason (it says) that delay and suspension of work damages are primarily involved which might not have been recoverable administratively through an equitable adjustment even had it prevailed before the ASBCA on the issue of liability — an assertion presumably based on the fact that the contract did not contain a “suspension of work” provision. Defendant has interposed no objection to plaintiff’s proceeding here on this basis.

 Section 4 also contained the following paragraphs covering two preproduction units, which paragraphs were waived by section 15 of the contract:
“4.3 Bounce test. — The applicable bounce test as speeifled for components shall be applied as follows:
“4.3.1 Preproduction test. — The Receiver-Transmitter and Coder-Control, Interrogator Set KIT-97 ( ) /TPX, in their respective transit cases, shall be
placed on the table of the Package Tester as made by the L.A.B. Corporation, Summit, New Jersey, or equal, and shall be constrained fiom horizontal motion of more than 2 inches by suitable wooden fences. The package tester shafts in phase, shall be operated at a speed, of 285 r.p.m. +1 percent, for a total of 3 hours. During each %-hour period of the test, the transit case (with contained equipment) shall rest on a different face.”

 This Division was the Quality Assurance Activity designated by the contracting officer.

 The Board member who presided at this hearing did not participate in the decision.

 The dissenting member wrote as follows: “I dissent because I believe the record supports the position of appellant, regardless of whether the par. 3.12 requirement be regarded as a manufacturing process or a test. Par. 3.12 was eliminated and a more rigid procedure under par. 4.19 substituted therefor by agreement of the parties and for the benefit of both as clearly shown by the testimony of the Government’s Mr. Mead and appellant’s Mr. Harvey. After 135 of 230 satisfactory sets had been accepted — not one rejection — the contract was unilaterally changed again by reinserting par. 3.12 for no apparent reason other than caprice or whimsy.”

 In view of these conclusions, it is unnecessary to determine whether the paragraph 3.12 bounce conditioning requirement was a test requirement.

 Mead was called as a rebuttal witness by plaintiff In the Board proceedlngs¡ at wbicb time be was still in Government employ. Tbe Government attorney did not cross-examine bim. ' :

 The action of the parties in performing and accepting performance of a contract before a controversy arises is highly relevant in determining what the parties intended, particularly when their intention is not expressed in writing. See e.g., Universal Match Corporation v. United States, 161 Ct. Cl. 418, 422 (1968), and cases cited in fn. 4; Williston Contracts (3d ed.) § 623.

 See generally Fox Valley Engineering Inc. v. United States, 151 Ct. Cl. 228, 239-40 (1960); Shepherd v. United States, 125 Ct. Cl. 724, 737, 113 F. Supp. 648, 654 (1953); General Casualty Co. of America v. United States, 130 Ct. Cl. 520, 533, 127 F. Supp. 805, 812-13 (1955), cert. denied 349 U.S. 938.