**TILLEY CONSTRUCTORS & ENGINEERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 587–85C.**

United States Claims Court.

Sept. 30, 1988.

David L. Reynolds, Jackson, Miss., attorney of record for plaintiff.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

### REGINALD W. GIBSON, Judge:

*Introduction*

On October 4, 1985, Tilley Constructors & Engineers, Inc. (hereinafter Tilley or plaintiff) filed an action in this court for an equitable adjustment of its contract with the United States through the Department of the Navy (hereinafter government or defendant). Tilley contends that the government unilaterally modified the original contract *after* its bid was accepted. The gravamen thereof was that its performance under the allegedly modified contract cost Tilley $368,177.55 more than performance would have under the original agreement. Plaintiff's complaint also requests additional time in which to complete its performance under the modified contract.

This opinion addresses the government's motion for partial summary judgment under RUSCC 56 which avers that the contract and the incorporated drawings, upon which Tilley bid, were patently clear in their meaning and thus were not subject to misinterpretation by a reasonable and prudent contractor. The jurisdiction of this court is based upon 28 U.S.C. § 1491 and the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.*

We grant the government's motion for partial summary judgment because we find no ambiguity in the operative contractual

provisions and, thus, plaintiff's interpretation thereof was unreasonable.

*Statement of the Facts*

In July of 1982, the Department of the Navy, Naval Facilities Engineering Command (Navy) entered into a contract with Tilley Constructors & Engineers, Inc. for the construction of an oceanographic research laboratory in Bay St. Louis, Mississippi. The contract required Tilley to construct a concrete superstructure with architectural pre-cast concrete (APC) panels covering the exterior of the building. Under the terms of the contract, Tilley (the prime contractor) was to *select* a manufacturer (subcontractor) with at least five years of experience in pre-cast concrete manufacturing to design and construct the APC panels to be facially installed on the research laboratory.[1] Contractually, the panels were to be erected on the laboratory between January and April of 1983. The contract also provided in ¶ 1.4.3 that "[t]he APC manufacturer shall be solely responsible for the design of all straps, *bolts*, etc. required to secure embedded *weld plates in the APC*" (emphasis added).[2] Another critical provision in the contract, ¶ 2.1.5, provided that the anchoring devices were to be *as depicted* in the set of contract drawings.[3]

Included with the narrative portion of the contract upon which Tilley based its submitted bid was a *set* of graphic contract drawings. Said drawings depicted a steel plate, embedded within *each* APC panel, to which steel angle plates ("L" shaped) were mounted. The angle plates were used to join the APC panels to the building columns and were attached at one end by a

---

**1.** The following operative contractual provision stated that:

> 1.4.1. All cast units shall be the product of a manufacturer who is regularly engaged in the production of architectural precast concrete units, and has had at least five years experience in the manufacture of similar cast unit work. They shall also have the financial capability and production facilities to meet the required schedule.

**2.** The following operative contractual provision stated that:

> 1.4.2. The APC manufacturer shall be solely responsible for the proper design of cast units to withstand *all* stresses, strains and

temperature changes. The APC manufacturer *shall be solely responsible* for the design of all straps, bolts, etc. required to secure embedded weld plates in the APC. The blast loads shall be as indicated on the building elevation drawings. The Contractor shall be solely responsible for all stresses incurred during erection.

(emphasis added).

**3.** Paragraph 2.1.5 stated that:

> 2.1.5. Anchoring devices, inserts, etc., shall be either galvanized or corrosion resistant types approved by the Contracting Officer and as detailed on the drawings.

bolt and nut through the anchor into the steel plate of the APC panel and welded at the other end to the adjoining building column. The defendant has submitted nine (9) contract drawings that depict the "L" shaped steel angle plate connections to the APC panels, and each further depicts the angles mounted by a weld at one end and a bolt at the other end.[4]

In furtherance of, and consistent with, the prime contract, Tilley selected Cothran Stone Co. (Cothran) to design and manufacture the APC panels. Following thereon, Cothran, on November 11, 1982, submitted shop drawings to Tilley that depicted the steel angle plate connectors *welded* at *both* ends to the APC panels. Said shop drawings of Cothran, purporting to comply with ¶ 1.4.2 of the contract as well as the contract drawings, did *not* call for any bolts to be used in connecting the panels to the structure. These particular drawings, otherwise referred to by the parties as "transmittal number 54," were later forwarded by Tilley to the Department of the Navy resident officer in charge of construction (ROICC).

On or about November 30, 1982, Tilley received a letter, dated November 26, 1982, from the ROICC, apparently in response to an inquiry made by Tilley, stating:

> e. Precast connections can be welded at bottom but bolting at top *as detailed is desired.* Shop drawings should, in any case, show connection design for review by structural engineer as required. Any proposed changes should be clearly noted and explained.

Appendix to Pltf's Complaint, p. 4 (emphasis added).

An on-site meeting of representatives of the parties took place thereafter on January 5, 1983, at which time the Navy informed Tilley that the steel angle connector plates must be joined to the APC panels by bolts at one end, although the lower end of the angle could be welded to the APC panel. The fact of this meeting and the information passed between the parties were later confirmed in a letter by the Navy to Tilley on January 14, 1983, along with the return of "transmittal number 54," which the Navy rejected because it did not depict bolted APC panel joints as required by contract drawings. The Navy also requested that Tilley resubmit shop drawings that call for bolted joints as indicated in the contract.

Tilley followed the Navy's rejection of "transmittal number 54" with a letter dated January 17, 1983, stating that, in Tilley's opinion, "your instructions to use bolted connections with slotted angles [was] in addition to the requirements of the specifications and details on the plans." The letter also stated that this "addition" to the contract would cost time and money for which Tilley would expect compensation.

On January 21, 1983, Tilley resubmitted shop drawings consistent with the Navy's demand letter of January 14, 1983, *supra, i.e.,* these drawings showed a bolted steel angle plate connection as the Navy had demanded. The Navy thereafter requested that Cothran, through Tilley, include design calculations for the steel angle plate joints. Tilley, while stating again that such request was a contract change and would cause additional delays for which the Navy would have to compensate it, provided the design calculations to the Navy on February 14, 1983. On April 6 of that year, as a consequence of the foregoing, the Navy gave its final approval of Tilley's modified design of the APC panel connections.

As construction of the research lab proceeded under the terms of the contract, two additional problems, according to Tilley, surfaced: (i) the Navy directed Tilley to "change the specified shims;" and (ii) the connections between the APC panels and the roof slab did not fit together properly. Tilley has alleged that it was not allowed to follow the design of Cothran or to perform its tasks in accordance with good construction practice because of changes made to the original contract requirements by the Navy. While the Navy denied that they were changing any contract requirements,

---

4. *See* Appendix attached for contract drawings.

Tilley again claimed additional damages due to the above contract changes.

Following completion, in December 1984, Tilley filed a claim for damages with the Navy's contracting officer. The Navy, on March 22, 1985, returned said claim to Tilley unprocessed, stating in its cover letter that because it was not *properly certified,* it was "not acceptable." Included in the cover letter was the demand that Tilley, before the Navy will act upon the complaint, submit a certification reading as follows:

> I certify that the claim is made in good faith, that the supporting data is accurate and complete to the best of our knowledge and belief; and that the amount requested accurately reflects our contract adjustment for which we believe the Government is liable.

Tilley resubmitted its claim to the contracting officer with the certification required by the Navy on March 25, 1985, and was thereafter informed that the Navy would issue a decision on its claim no later than July 15, 1985. The Navy thereafter sent Tilley a letter dated June 25, 1985, stating that a decision would be issued prior to September 15, 1985, and that the Navy would notify Tilley of any delays.

On September 20, 1985, five days after the date by which the Navy had informed Tilley a decision would be reached, the Navy telephoned Tilley to say that a decision had not been reached and that it was not known just when a final decision would be reached. Because Tilley deemed the foregoing to be a denial by the contracting officer, it filed a claim in this court on October 4, 1985, alleging damages in the amount of $368,117.55 plus interest as of the date of original certification, and for an extension of contract completion time.

The defendant has moved for *partial* summary judgment solely on the issue of— whether the contract *required* bolts to be used to attach the steel angle plates to adjacent APC panels or whether that was discretionary with the APC manufacturer. For the reasons stated below, we grant defendant's motion.

## Contentions of the Parties

### A. *Plaintiff*

Plaintiff, Tilley, contends that its interpretation of the contract provisions and accompanying drawings, that the steel angle plate connectors could be welded to the APC panels at both ends, was reasonable. Plaintiff further argues that while there may be a valid dispute, the Navy, as the drafter of the contract, has the responsibility for making its intended meaning clear, and that any ambiguity in the contract should be construed to mean what plaintiff, as the non-drafting party, reasonably believed it to mean.

Tilley relies, therefore, upon two grounds to support the reasonableness of its interpretation. First, it asserts that the APC manufacturer was *solely* responsible for the design of the APC panels and connections and, in view of such, the contract drawings that depicted one end of the steel angle plate connection bolted to the APC panel were for illustrative purposes only. Secondly, the plaintiff also points for support to the language in the letter it received from the Navy dated November 26, 1982, *supra,* in response to its inquiry, stating that "bolting at top as detailed *is desired*" (emphasis added). Plaintiff urges this court to hold that by using the phrase "is desired," the Navy tacitly admits that the contract itself *did not* make the requirement to bolt clear and unambiguous, but rather left it to the discretion of the manufacturer.

Therefore, argues plaintiff, since it contentiously complied under protest with defendant's demand, the court should construe the Navy's requirement as a modification to the contract and allow plaintiff an appropriate equitable adjustment.

### B. *Defendant*

Conversely, the defendant contends that the contract and related drawings clearly require that the steel angle plate connectors be *bolted,* rather than welded, to the APC panels. First, says defendant, contract ¶ 1.4.2 cannot reasonably be read to permit the APC manufacturer to weld the steel angle plates to the APC panels be-

cause that provision applies to the APC panels themselves, not to the panel connections to the building columns. Second, ¶ 2.1.5 unequivocally requires that all "[a]nchoring devices, inserts, etc., shall be either galvanized or corrosion resistant types approved by the Contracting Officer *and as detailed on the drawings* " (emphasis added). The defendant therefore concludes that to accept plaintiff's interpretation would completely "write out" of the contract ¶ 2.1.5 and render the contract drawings of the connection meaningless.

Defendant has, therefore, moved for partial summary judgment on the issue of—whether the contract clearly and unambiguously *requires* that one end of the steel angle connectors be bolted to the APC panel plate. However, the defendant has not addressed plaintiff's other claims for additional costs for having to allow for vertical and horizontal movement of the panels or for extra work required to fit the roof slabs to the APC panels.

*Scope of the Court's Opinion*

Against this background, the court must determine—whether contract # N62467–80–C–0242 clearly and unambiguously required the plaintiff to bolt, as opposed to weld, one end of the steel angle connectors to the embedded weld plate of the APC panel where the *contract drawings* depict such a bolted connection but the *contract* provides that the APC manufacturer is responsible for designing the APC panels. The court will also address the issue of—whether, assuming *arguendo*, as plaintiff contends, the contract is ambiguous, said ambiguity was patently obvious, thus giving rise to plaintiff's duty to seek an immediate clarification from the contracting officer.

*Discussion*

A. *Contract Interpretation*

Interpretation of contract provisions is a question of law which is properly decided by a court. *See P.J. Maffei Building Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). As both parties to this action point to the written contract in support of their respective positions, this court is therefore called upon to serve as interpreter thereof, which is to say we must "step into the shoes of a 'reasonable and prudent contractor' and decide how such a contractor would act in the [plaintiff's] situation." *Id.* at 916, *citing H.N. Bailey & Associates v. United States*, 196 Ct.Cl. 156, 163, 449 F.2d 387, 390 (1971).

In implementing such a seemingly subjective standard, the court must, of course, apply basic principles of contract law. Initially, the court must read the contract as a whole, rather than isolating particular terms and attempting to glean their meaning outside of their intended context. *See Gelco Builders & Burjay Construction Corp. v. United States*, 177 Ct.Cl. 1025, 369 F.2d 992 (1966). Thus, where reasonably possible, the contract should be read in such a way as to give *effect and meaning to all its terms*, and to render no term meaningless. Moreover, the words used in the contract should be given their *ordinary* meaning. *See ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975). Finally, the court will read the terms of the contract to find concord, rather than discord. *See Unicon Management Corp. v. United States*, 179 Ct.Cl. 534, 538, 375 F.2d 804, 806 (1967).

Yet, despite these guidelines, courts are, of course, often faced with contracts that can only be described as ambiguous. An ambiguity in this context is defined as a contract that can sustain more than one reasonable interpretation. *See Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 627, 427 F.2d 1233, 1245 (1970); *Salem Engineering and Construction Corp. v. United States*, 2 Cl.Ct. 803, 806 (1983). Upon the finding of such an ambiguity, the doctrine of *contra proferentem* instructs the court that the provision should be construed against the drafter, provided, as has already been stated, that the non-drafting party's interpretation is reasonable, *see Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 861 (1987), *citing W.P.C. Enterprises v. United States*, 163 Ct.Cl. 1, 6–7, 323 F.2d 874, 876–77 (1963), and the ambiguity is *not* patently obvious, as discussed *infra*.

This background leads us to now consider plaintiff's contention that the contract is ambiguous. This is so, says plaintiff, because the drawings depict the angle bolted at one end to the APC panel and, on the other hand, it (the contract) permits the contractor to design the steel angle plate connections. Such circumstance, argues plaintiff, should be construed against the Navy. Plaintiff rests this contention first upon ¶ 1.4.2 of the contract:

[i] The APC manufacturer shall be solely responsible for the proper design of cast units to withstand all stresses, strains, and temperature changes.

[ii] The APC manufacturer shall be solely responsible for the design of all straps, bolts, etc. required to secure embedded weld plates in the APC.

[iii] The blast loads shall be as indicated on the building elevation drawings. [and]

[iv] The contractor shall be solely responsible for all stresses and strains incurred during erection.

According to the plaintiff, said provision requires it to design both the panel and its connectors to the building column.

Reading the foregoing provision as liberally as plaintiff would have us do, this court is nevertheless unable to find creditable support for this contention anywhere in ¶ 1.4.2. The first sentence does not contain any reference whatsoever to connectors. Rather, this sentence speaks solely to the requirements concerning the cast units (APC panels) themselves, and simply requires that they be made to withstand *all* stresses, strains, and temperature changes. It seems to this court to be only reasonable for the Navy to require an adequate type of concrete and construction so as to "withstand *all* stresses [and] strains," and the plaintiff's contention that this sentence does anything more is, in our judgment, wholly untenable. Thus, the charge is that the panels, as designed, must be able to withstand *all* stresses and strains—even those caused by the insertion of bolts into the panel weld plates, as contemplated by the contract drawings. This does not mean that the contractor may dictate or limit what stresses and strains the panels must withstand, for they clearly must withstand *all*.

Similarly, we read the second sentence in ¶ 1.4.2 *not* to apply to APC panel connections, but instead to the intrinsic construction of the APC panels themselves. In each panel, there was to be embedded a steel receptive plate to which connections could be bolted as depicted in the contract drawings. The court reads this provision "as one that gives" the Navy assurance that these plates would not become dislodged from the panel by a crack in a weld. Nowhere in this sentence can the court find so much as a suggestion that the APC manufacturer is charged with the responsibility of designing the connectors which tie the APC panels *to the structure*. Not surprisingly, plaintiff points to no language therein that could reasonably be so read.

The third and fourth sentences are equally devoid of any such interpretation. While the third sentence describes blast loads, the fourth serves to make clear that the "stresses" referred to in the first sentence include those incurred *during erection*.

In short, we are constrained to read ¶ 1.4.2 as applying to the APC panels themselves, not to the manner by which the connectors (angle plates) are tied to the APC panels and to the building columns. We find, in light of the foregoing, that the plaintiff's interpretation of this paragraph as providing the contractor with discretionary authority to design the manner by which the APC panel is *attached* to the angle plates is not a reasonable one.

This is especially true in light of the fact that no less than nine (9) contract drawings of the APC panel connectors clearly depict steel angles *bolted* to the embedded APC panel plates at one end. In addition, ¶ 2.1.5 unambiguously states that "anchoring devices ... shall be *as detailed on the drawings*." (emphasis added). The court has no difficulty in understanding the term "anchoring devices," in the context of the overall purpose of the APC panels, to include the connectors in question. Not only

does plaintiff fail to challenge the defendant's use of the term in that context, but the plaintiff itself used the term "anchoring method" to describe the subject matter of this dispute in a letter to the contracting officer dated March 7, 1983. (Appendix to Pltf's Complaint, p. 21).

The plaintiff is asking this court to isolate ¶ 1.4.2 apart from its context and glean from it a meaning, or implication, that is perfectly contrary to the balance of the contract. This the court cannot do. Aside from the fact that we are unable to read ¶ 1.4.2 in such a tortuous manner as to give the contractor authority to design the APC panel connectors, such an excursion would run contrary to the basic principles of contract law, *supra.* For example, rules requiring the court to read the contract as a whole, to find concord rather than discord, and to avoid interpretations that render other provisions useless from "the perspective of '... reasonably intelligent person[s] acquainted with the contemporary circumstances'" would all be compromised if we were to accept plaintiff's interpretation. *ITT Arctic,* 207 Ct.Cl. at 752, 524 F.2d at 684, *citing Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The court must, therefore, "[ascribe] to the contract language 'its ordinary and commonly accepted meaning' ... without twisted or strained out of context analysis." *ITT Arctic,* 207 Ct.Cl. at 752, 524 F.2d at 684, *quoting Hol–Gar Manufacturing Corp. v. United States,* 169 Ct.Cl. 384, 390, 351 F.2d 972, 976 (1965); *Aero Mayflower Transit Co. v. United States,* 162 Ct.Cl. 233, 237 (1963). In doing so, we are unable to read ¶ 1.4.2 to grant the plaintiff authority to design the panel connectors.

It is worthy of note, though not surprising, that plaintiff has not offered any explanation as to how it interprets ¶ 2.1.5, and we can think of no reasonable alternative interpretation to that already provided, to wit, that the drawings, which depicted the use of bolts, were to be followed in the design of the connectors. Plaintiff's proffered interpretation of ¶ 1.4.2, therefore, would be perfectly contrary to ¶ 2.1.5 and consequently would render the contract drawings useless, or, as plaintiff cryptically phrases it, "for illustrative purposes only."

■ In addition to its averment regarding ¶ 1.4.2, plaintiff relies upon a letter dated November 26, 1982, from the Navy to plaintiff, stating that use of bolted APC panel connectors as detailed in the drawings "is desired," in support of its contention that the APC manufacturer had at least tacit authority to design the connectors. Plaintiff introduces this letter as an admission on the part of the Navy that the contract was not clear as to what connectors (bolts vs. welds) were required and that the Navy only "desired," as opposed to "required," that the connectors be designed according to the drawings.

This court does not attribute to said letter near the significance that plaintiff does for the simple reason that it bubbled up *after the fact.* The plaintiff had long before submitted its bid and the contract had been awarded. By the time the Navy sent the letter on November 26, 1982, it had already received "transmittal number 54" from Cothran (November 11, 1982), and was therefore aware that its position was contrary to that of the contractor. While conduct of the parties *prior* to the dispute can be very useful evidence in determining what their true intentions were, the same is not true as to conduct taking place *post litem motam.* "Only the action of the parties *'before a controversy arises* is highly relevant in determining what the parties intended.'" *Dynamics Corporation v. United States,* 182 Ct.Cl. 62, 73, 389 F.2d 424, 430 (1968), *quoting Northbridge Electronics, Inc. v. United States,* 175 Ct.Cl. 426, 438, n. 8 (1966).

Clearly, the Navy realized, at the time the November 26 letter was written, that plaintiff was contemplating connecting the APC panels to the building columns with welds, not bolts. Though legal action may not yet have been imminent, a dispute certainly was. The Navy was well aware that plaintiff would not welcome the position being taken by it (the Navy) and that the plaintiff would likely seek to avoid making

such changes. That the Navy did not respond to plaintiff's submittal in an adversarial tone indicates, to this court, very little, particularly in view of the unambiguous contractual provisions and related drawings.

The plaintiff's last point in support of its contention that the contractor was authorized to design the panel connectors is that —the Navy would not have required the contractor to submit design calculations for such had they not intended the contractor to design the connectors. Appendix to Pltf's Complaint, p. 15. Again, this request came *after* the dispute had arisen and, for this reason, is also not very meaningful. *See Dynamics*, 182 Ct.Cl. at 73, 389 F.2d at 430. Furthermore, what the plaintiff fails to realize is that the Navy did not require it to furnish design calculations for discretionary connectors, but rather design calculations for *bolted connectors*, in *accord* with the contract drawings, not in spite of them.

The Navy's explicit and graphic requirement that the APC panels be connected to the building column by bolts, as opposed to welds, is not ambiguous, but clear beyond cavil. The contract drawings clearly and unquestionably depict such a connection, and ¶ 2.1.5 lucidly requires the contractor to construct the anchoring devices in accordance with *those drawings*. Plaintiff offers no *reasonable* explanation for its contrary interpretation, and this court in its search is unable to find one. Therefore, we must hold that because we find the contract to be unambiguous, the Navy is *not* indebted to the contractor for any extra costs the "contractor" incurred as a result of having to alter, modify, and redesign the APC panels so as to utilize bolted connections.

### B. *Duty To Seek Clarification*

■■■ Assuming *arguendo* that ¶ 1.4.2 could reasonably be read to be ambiguous, the plaintiff would still not prevail on these facts, for the existence of a *patent* ambiguity, as here, gives rise to a bidder's duty to seek a clarification from the contracting officer. *See Collins International Ser-*

*vice Co. v. United States*, 744 F.2d 812, 814 (Fed.Cir.1984); *Newsom v. United States*, 230 Ct.Cl. 301, 676 F.2d 647 (1982); *Mountain Home Contractors v. United States*, 192 Ct.Cl. 16, 20–21, 425 F.2d 1260, 1263 (1970); *Cherryhill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 762–64 (1985). A patent ambiguity has been defined as "an obvious omission, inconsistency, or discrepancy of significance." *Beacon Construction Co. v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963). Failure of a bidder to seek a clarification of a patent ambiguity (so defined) *prior* to submitting its bid *precludes* that bidder from later recovering from work that it reasonably, but wrongly, believed was not required by the contract. *See Newsom*, 230 Ct.Cl. at 303, 676 F.2d at 649, and cases cited therein.

While this doctrine of patent ambiguity runs contrary to the doctrine of *contra proferentem*, it serves as a necessary exception to protect the government from being taken advantage of by contractors who "bridge the gap in [their] own favor." *Max Drill*, 192 Ct.Cl. at 625, 427 F.2d at 1244. It also benefits the bidders themselves in that it ensures that all bidders are in fact bidding on identical specifications. *See Newsom*, 230 Ct.Cl. at 303, 676 F.2d at 649.

■■■ In the case at bar, assuming that ¶ 1.4.2 can reasonably be read to give the contractor authority to design the APC connectors, we hold that such an interpretation gives rise to a patent ambiguity, as ¶ 2.1.5 would directly contradict it. Plaintiff failed not only to seek clarification of its perceived ambiguity as to whether bolted connections were required, but it further omitted tendering any explanation for such failure. Furthermore, plaintiff cavalierly noticed that the nine (9) contract drawings depicted a bolted APC panel connection, but negligently assumed that they were "for illustrative purposes only." The court finds it difficult, as it must, to imagine a clearer example of a contractor "[bridging] the gap in his own favor." *Max Drill*, 192 Ct.Cl. at 625, 427 F.2d at 1244. Hence, even assuming an ambiguity, we find that

plaintiff's interpretation gives rise to a *patent* (and not latent) ambiguity in that it presents two clearly obvious discrepancies and inconsistencies.

As nothing in the pleadings of either party indicates that plaintiff ever fulfilled its duty to seek clarification of this obvious patent ambiguity, it cannot recover an equitable adjustment for this reason as well.

*Conclusion*

The contract between the Navy and Tilley Constructors clearly and unambiguously required bolted connections of the APC panels to the building columns. Furthermore, even assuming that there did exist

such an ambiguity (*i.e.*, patent), the plaintiff, faced with contradictory provisions and contract drawings, had a duty to seek a clarification from the contracting officer, which duty it did not fulfill.

For all of the foregoing reasons, defendant's motion for partial summary judgment is granted. A status conference is hereby set for Tuesday, October 11, 1988, at 10:00 a.m., at the National Courts Building, Washington, D.C. The appropriate manner of proceeding on all remaining issues, if any, will be the subject matter.

IT IS SO ORDERED.

## APPENDIX

DETAIL 6/A-8 (PAR 5a.)

COLUMN

SEE NOTES
SECTION
6 A-8
WELD

ANGLE

MIN. 2 PER PANEL

BOLT MAX VERT SPACING
8'-0" O.C.

WELD

ANGLE

BOLT

APC PANEL →

← APC PANEL

BACKER ROD & CAULK

1/2"

EMBEDDED PLATE

7 A-8  APC PANEL SUPPORT & COLUMN

SCALE 1½" = 1'-0"

DETAIL 7/A-8    (PAR 5b)

DOVETAIL
SLOT

$\mathcal{E}$ MAX
SPACING 10'-0" O.C.

DOVETAIL
SLOT

STRAP

WELD

3/8"$\phi$ EXP. SHIELD @
18" O.C.

ROOF BEAM

EMBEDDED
PLATE
SIMILAR TO W/
MAX. SPACING
10'-0" O.C.

EMBEDDED
PLATE

WELD

ANGLE

BOLT

$\dfrac{6}{A-8}$

ADJUST LOCATION OF
WELD PLATE WHERE PANEL
STOPS BELOW STRUCTURE
COVERED ENTRANCE WAYS.

APC
PANEL

$\dfrac{9}{A-8}$ APC PANEL SUPPORT - ROOF BEAM

SCALE 1 $\frac{1}{2}$" = 1'-0"

# DETAIL 9/ A-8    (PAR 5c)

SIMILAR TO
W/ MAX·
SPACING 10'-0" O·C·

EMBEDDED PLATE
HIGH DENSITY NON-METALLIC SHIMS 4"X4" MAX· SPACING 10'-0" O·C· MIN· 2 PER PANEL

BACKER ROD & CAULK

APC PANEL

ANGLE

BOLT

WELD

EMBEDDED PLATE

FLOOR

**10 / A-8** APC PANEL SUPPORT @ FLOOR SLAB
SCALE $1\frac{1}{2}" = 1'-0"$

DETAIL 10/A-8 (PAR 5d)

COLUMN

D

FURRING CHANNELS

5/8" GYP. BD

METAL STUDS

9 WELD

ANGLE
BOLT

EMBEDDED PLATE

2" FURRING CHANNELS

5/8" GYP. BOARD TYP.

APC
PANEL

INTERIOR WALL
METAL STUDS

6" APC PANEL —
VINYL BASE STOPS HERE

4"

2 LAYERS 5/8" GYP BD

(PNT REVEAL, SEE
GEN NOTE #4, SHT A-5)

12 / A-8    DETAIL ⌐ REVEAL

SCALE $1\frac{1}{2}" = 1'-0"$

DETAIL   12/A-8    (PAR 5e)

APC PANEL

PL 7X8X8 W/4½" ∅ X 4" STUDS & (1) 1"∅ HS BOLT

BOLT

2½" X 4" X1/4"BAR W/ 1" ∅ HOLE

ANGLE

HAND TIGHTEN NUT & TACK WELD

WELD

ANGLE W/2" ∅ HOLE IN ONE LEG. NOTE THIS ANGLE SIZE VARIES AS TO LOAD REQUIREMENT. (TO BE SIZED BY PANEL SUPPLIER.)

BOLT D.O. OPP.

ANGLE

APC PANEL

BACKER ROD & CAULK

EMBEDDED PLATE

MIN. 2 PER PANEL MAX. VERT. SPACING 8'-0' O.C.

EMBEDDED PLATE

L SIZED BY PANEL SUPPLIER

STEEL COL.

6" APC PANEL

COLUMN

1/2"

1"

1"

APC PANEL SUPPORT @ STL. CORNER COL.

6
A-12

ADDITIVE BID ITEM

SCALE 1½" = 1'=0"

DETAIL  6/A-12          (PAR 5F)

COLUMN

WELD
MIN 2 PER PANEL
MAX VERT. SPACING
5'-0" O.C.

WELD
SEE DET S
SECTION

6
A-12

ANGLE

ANGLE

BOLT

BOLT

APC
PANEL

APC
PANEL

BACKER ROD & CAULK

1/2"

EMBEDDED
PLATE

7
A-12
APC PANEL SUPPORT ⓐ STL. COL.

ADDITIVE BID ITEM

SCALE $1\frac{1}{2}" = 1'-0"$

DETAIL  7/A-12   (PAR 5f)

DOVETAIL
SLOT

DOVETAIL
SLOT

STRAP

WELD

3/8" Ø EXP. SHIELD
& 18" OC.

DOVETAIL SLOT &
STRAP ANCHOR
MAX. SPACING
10'-0" O.C.

STEEL BEAM

COLUMN

EMBEDDED
PLATE

SIMILAR TO
W/ MAX
SPACING
10'-0" O.C.

6
A-12

WELD

ANGLE

BOLT

APC
PANEL

8
A-12

APC PANEL SUPPORT @ ROOF BEAM

ADDITIVE BID ITEM

SCALE 1½" = 1'-0"

DETAIL 8 / A-12          (PAR 5f)

APC
PANEL

SIMILAR TO ⑥/A-12
W/MAX
SPACING
10'-0" OC

BOLT

ANGLE

WELD

EMBEDDED
PLATE

EMBEDDED
PLATE

HIGH DENSITY NON-METALLIC
SHIMS 4"x4" MAX SPACING
10'-0" O.C. MIN 2 PER PANEL.
1/2"

FLOOR

⑨/A-12 APC PANEL SUPPORT , FLOOR SLAB
ADDITIVE BID ITEM                    SCALE $1\frac{1}{2}$" = 1'-0"

DETAIL 9/A-12         (PAR 5g)