**SERGENT MECHANICAL SYSTEMS, INC. Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1577C.

United States Court of Federal Claims.

Oct. 18, 1995.

Reissued for Publication Nov. 17, 1995.

William L. Bruckner, San Diego, California, for plaintiff.

John S. Groat, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen and Mary Mitchelson, for defendant. Maj. H. Josseph Batey, Arlington, Virginia, of counsel.

## OPINION

ROBINSON, Judge:

This matter is before the court after trial, which was held in October 1993. The parties submitted post-trial briefs, and post-trial oral argument was heard on September 7, 1994.

Plaintiff originally filed suit in 1991 claiming entitlement to contract damages based on 11 claims which the contracting officer had denied either in whole or in part. Shortly before trial was to begin, the parties entered a joint stipulation under which several of plaintiff's pending claims were either withdrawn or settled. Based on the joint stipulation, filed October 12, 1993, the parties agreed to entry of judgment of $57,274 in plaintiff's favor as to Claims 2, 3, 10 and 11, with CDA interest to be computed from November 15, 1991; Claims 1.D, 1.E, 1.G, and 5 were withdrawn. As for those claims which remained outstanding at the beginning of trial, the joint stipulation established the amount of damages which would be due plaintiff with respect to each outstanding claim in the event of the court's finding of liability. After carefully considering the evidence submitted at trial, along with the post-trial filings and argument, the court has decided in plaintiff's favor all but a few of the outstanding claims.

### Background

Plaintiff Sergent Mechanical Systems, Inc., ("Sergent" or "the contractor") entered into a fixed-price construction contract, Solicitation No. FO4684–89–C0033, with the Department of the Air Force on June 20, 1989, wherein it agreed to perform certain work at Vandenberg Air Force Base ("Vandenberg") in California. The project has been referred to in the record as the Vandenberg Refurbishment, Phase I.

### Relevant Contract Provisions

The contract required Sergent to perform all operations necessary to upgrade the stand-by power systems in the Intercontinental Ballistic Missile Launch Facilities ("LFs") and Launch Control Facilities ("LCFs") at various Vandenberg sites, including removing existing diesel electric units, day tanks, underground fuel storage tanks ("USTs") and associated piping and equipment; electrical modifications; restoration of topside surface conditions to original configuration by replacing displaced soils and asphalt; providing seven trailer-mounted 100 kW diesel generator sets; removing and steam-cleaning of all USTs and day tanks; transporting of these tanks to a designated location; construction of concrete pads; and installation of automatic transfer switches for use with the trailer-mounted generator sets.

There were 11 modifications made to the contract (Nos. P00001–P00011) during performance, which increased the total contract price from $1,409,002.00 to $1,449,369.65.

The contract had called for commencement of work on February 11, 1989, and completion by May 6, 1992. Construction, however, did not actually begin until August 15, 1989, and was completed August 20, 1991, with an actual total of 556 days of performance. The contract provided that the contractor was to complete work on one of 16 sites before beginning to work on another. The contractor was also required to give the Air Force at least 10 days advance notice of its readiness to begin work on a particular site. The contract specified the number of days allowed to complete each site; 45 days were allowed for most sites, and 60 days were allowed at sites involving tanks more than 20 feet deep.

The contract consisted of the solicitation, amendments, "special" requirements, incorporated clauses from the Federal Acquisition

Regulations (FAR), the Department of Defense FAR Supplement (DFARS), and the project's technical specifications and drawings.

The contract incorporated FAR 52.236–3 (1984), "Site Investigations and Conditions Affecting the Work," which included the following language:

(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface material or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.

Another paragraph, based on FAR 52.236–2 (1984), set forth the procedures which the contractor had to follow if it encountered a differing site condition while performing the work:

The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

The contract also contained a standard "Changes" clause, based on FAR 52.243–4 (1987):

(a) The Contracting Officer may, at any time ... by written order ... make changes within the general scope of the contract ... (2) In the method or manner of performance of the work....

(b) Any other written or oral order ... that causes a change shall be treated as a change order, provided, that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.

(c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

Another provision, based on FAR 52.236–21, "Specifications and Drawings for Construction," directed that, should a difference between the drawings and the specifications arise, the specifications would govern. Further, in case of discrepancy in the figures, drawings, or specifications, the matter shall be promptly submitted to the contracting officer for a written decision.

An associated contract clause, based on DFARS 252.236–7001 (1987), addressed contract drawings and specifications:

(b) Omissions from drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

(c) The Contractor shall check all drawings furnished him immediately upon their receipt and shall promptly notify the Contracting Officer of any discrepancies. Figures marked on drawings shall in general be followed in preference to scale measurements. Large scale drawings shall in general govern small scale drawings. The Contractor shall compare all drawings and verify the figures before laying out the work and will be responsible for any errors which might have been avoided thereby.

The contract further incorporated the U.S. Army Corps of Engineers' Safety and Health Requirements Manual (EM 385–1–1, 1987). Paragraph 23.A.13 of the manual provides that "precautions shall be taken in sloping or shoring the sides of excavations adjacent to a previously backfilled excavation or a fill ... [A]ttention shall also be paid to joints and seams of materials comprising a face and the slope of such seams and joints." Paragraph 23.A.14 also applied requiring that "support systems shall be planned and designed by a qualified person when an excavation is in excess of 20 feet in depth, adjacent to structures or improvements, or subject to vibration or ground water." Paragraph 7, 2F–3, required Sergent to provide sheeting, shoring and bracing of the adjacent earth and existing earth as necessary.

A contract provision headed "Permits and Responsibilities," based on FAR 52.236–7, made Sergent responsible "for complying with any Federal, State and municipal codes, and regulations applicable to the performance of work." Pursuant to this provision, Sergent was obligated to follow the Occupational Safety and Health Administration's excavation and shoring requirements, set forth at 29 C.F.R. § 1926.652 (1990).

The contract contained a "Suspension of Work" clause, based on FAR 52.212–12 (1984). The clause established Sergent's entitlement to compensation as the result of a government-directed or -caused suspension of work:

(a) The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or·any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government.

(b) If the performance of all or any part of the work is, for any unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

The contract's technical specifications, Division 2, paragraph 5, section 2F–2, required Sergent to field verify the locations of the tanks and piping indicated on the drawings.

### DISCUSSION

In an effort to simplify analysis of the case as whole, the court shall approach plaintiff's outstanding claims by reference to the numbers given the claims in the record and the briefs.

### Claims 1.A and 1.B

#### A. Findings of Fact.

The LCF–01E site was one of the three sites containing USTs buried at more than 20 feet below grade. The other two deep sites were designated LCF–DO and LCF–EO. The plans and specifications for LCF–01E indicated that the UST was at or about 40 feet below grade. In close proximity was the underground command capsule and, on the surface, the launch control building itself.

The capsule was a rectangular concrete structure with a curved roof—a shape described as a quonset hut. The capsule was

shown in the plans and specifications as slightly above the UST but positioned partially beneath the launch control building and centered to the south of the building. The UST was located so that its ends pointed east and west and its sides faced north and south.[1]

Before receiving the government's Notice to Proceed ("NTP") at LCF–01E, plaintiff had already successfully excavated the other two deep USTs at Vandenberg using an open-pit method of excavation. This method usually involved sloping three sides of the excavation area sufficiently to ensure their integrity, so that the work site would be safe from a cave-in or from a sloughing-off of the sides while workmen were operating equipment. The degree of slope chosen for a particular side or area of an excavation might depend on various factors, including the depth of the excavation, the type of soil or rock at the site and the degree of soil compaction present. For example, compact clay soils obviously could be excavated with a much steeper slope than loose sandy soils. Rock or more solid materials might be safely excavated using a vertical or nearly vertical cut (one with almost no slope). Usually, one side or end of an excavation made with the open-pit method would have a greater (or less steep) slope to create a ramp for equipment to enter and exit the pit.[2]

Plaintiff's plan of excavation for LCF–01E was calculated to allow it to extract the UST relatively quickly—well within the 60–day period allowed under the contract. Sergent's plan, simply stated, was to excavate to the 36–foot level, using the open-pit method with sloped sides, uncover the top of the UST with an excavator and then lower a "coffin-box" type of prefabricated shoring system onto the top of the exposed tank top to enable Sergent's crew to work safely in the pit. After removal of any residuum of fuel from the UST (which was reported to be leaking), Sergent's plan next called for attaching steel cables to eyelets in the ends of the UST and, using a bulldozer to help free the tank from the surrounding soil, lifting the tank vertically to a flat ledge at the 36 foot level. Subsequently, the UST was to be lifted to the top of the excavation, where it could be easily swung around and lowered onto a flat-bed truck for transport away from the site. The government approved Sergent's plan of excavation without any proposed changes.

Because of representations in the government's plans and specifications that the UST was positioned close to the launch control building and the buried capsule, Sergent began its sloped excavation approximately five feet to the south of the closest point of the southernmost wall of the launch control building, a distance which Sergent considered sufficient to avoid undercutting or endangering the foundations or footings of any of the south walls of the building. This distance was limited, however, by the need to reach the UST with a slope which would allow sufficient working space at the bottom of the excavation once the UST was reached. In other words, it was necessary to begin the cut reasonably close to the south side of the launch control building but not so close as to endanger the structural integrity of the building.[3]

The plans and specifications provided to Sergent did not show the presence of an antenna beneath the launch control building, a communications manhole beneath the antenna, and a leach field for a septic tank, which later interfered to some degree with

1. Although this general positioning description may be slightly inaccurate, it is sufficient for the purpose of visualizing and adequately understanding the relative locations of the various structures, roadways, parking areas and vegetation at the site and the court's later analysis.

2. In the record of this case, a slope is expressed as a ratio of the horizontal to the vertical. Consequently, the "greater" of two slopes is the one which is less steep; e.g., a one-to-one slope is less steep than a ¾–to–one slope.

3. The evidence is not clear as to the actual depth of the launch control building's footings for its south wall but, if they were standard footings for a building the size of the launch control building, according to Sergent's evidence, those footings are buried at least three feet and possibly five feet below grade, which would have given added support to the building's walls and would have lessened the risks associated with commencing the excavation only five feet from a corner point on the south wall of the launch control building.

the work. However, all other structures at the site were shown.

Plaintiff's plan further called for sloping the excavation's north side on a ¾-to–one ratio and sloping the pit's south side and east end on a one-to-one ratio. The excavation, as planned, had the advantage of the support provided by the large concrete capsule because it was located slightly above the UST but to some extent between the tank and the launch control building. Collectively, these physical factors would have allowed a ¾-to–one sloped excavation to reach the top of the UST with adequate space (approximately three to four feet of flat working area) on the north side of the tank, assuming, of course, that the tank was actually 40 feet from ground level and was no closer to the launch control building and capsule than was shown on the plans and specifications. Likewise, the one-to-one slope on the south side of the excavation would have given plenty of safe working room at the bottom of the pit on the south side of the UST once its top had been exposed.

Sergent's excavation plan did not specify areas where the excavated dirt was to be placed. However, due to the presence of structures and other clearly visible restrictions or other impediments at various locations around the launch control building (verified during the court's comprehensive site visit the day before trial), Sergent's excavation plan necessarily contemplated placing excavated material both at the east end and south side of the excavation. Further, since there were no sensitive or protected plant species identified to it on the plans and specifications furnished by the government for the site, Sergent also reasonably contemplated the removal and replacement of any brush or vegetation that might be growing in areas reasonably needed for excavation or soil storage, particularly in those areas to the south and east of the excavation.

Both of the earlier deep excavations were successfully completed using the method de-scribed above. Thus, plaintiff had recent and relevant experience with the open-pit method of tank extraction in similar soils and topography at Vandenberg when Sergent began excavating at LCF–01E. Sergent's first UST extractions were accomplished without any safety problems resulting from the excavations having begun close to ground-level structures or from the sloped excavation method. Upon removal of the UST, using the method described above, all extraction plans called for restoring the sites to grade and providing any additional fill dirt needed to fill the void created by extraction of the tank. Finally, during replacement of the excavated soil and additional fill to adjust for the missing UST, all sites were to be compacted to 95 percent.

Sergent failed to attend a pre-award conference and elected not to perform a pre-award site visit to LCF–01E. However, such contractor inactions, under the circumstances described here, neither were imprudent nor were they preconditions to submission of a responsive and responsible bid. It also became clear at trial that Sergent was an experienced contractor and performed the work with adequately trained workmen and appropriate equipment.

Sergent's approved plan to slope the excavation's sides to the described ratios was based upon two unscaled drawings attached to the plan of excavation submitted to the Air Force. Pl.Ex. 10. The digging permit given to Sergent shows that the Environmental Task Force Group ("Environmental") and all other necessary Vandenberg groups, had approved Sergent's excavation plan. The top unscaled drawing describes "limits of excavation" as 40 feet by 60 feet;[4] the bottom unscaled drawing gives no such indication.

On October 10, 1989, Richard Thibeault, Sergent's on-site project manager, made a routine pre-performance site visit accompanied by Vandenberg's contract surveillance inspector, Edward Meyer. Apparently, nei-

---

4. Neither party was able to convincingly explain the meaning of "limits of excavation" as it appears on Pl.Ex. 10. Consequently, it remains unclear whether adherence to the 40 × 60 "limit" on the excavation would have necessarily implied any harm to the chaparral near the site. What is clear, however, is that neither party relied on the 40 × 60 indication or on any of its possible interpretations at the time the excavation plan was approved or later, when the dispute over the chaparral erupted.

ther person at that time commented to the other about any potential limitations on the available work space at LCF–01E in connection with Sergent's approved excavation plan. However, Mr. Thibeault did note that there was a concrete drainage ditch not shown on the plans and that there was an old metal culvert that was in "bad shape."

The government issued its NTP on October 15, 1990, for the UST removal and electrical upgrade work at LCF–01E. Since Sergent had already mobilized most of the equipment needed at this site outside the entrance gate, Sergent was able to begin work at LCF–01E on that same date.

Although there is some confusion in the record respecting the dates certain events occurred, the court is satisfied that the sequence of events that follows is substantially correct:

On October 15 or 16, 1990—*i.e.*, after Mr. Thibeault's October 10 site visit but before the actual digging had begun, Sergent was told that their workers would not be able to use the southern and eastern edges of the area to be excavated. Mr. Meyer, the inspector, explained to Mr. Thibeault that the Air Force had determined that a particular species of manzanita bush, *arctostaphylos rudis,* or shagbark manzanita, was growing in those areas.[5] The Air Force believed that shagbark manzanita was an endangered plant species and that it could not lawfully allow the bushes to be disturbed. (The area where these plants were growing is hereafter referred to as "the restricted area.") On the day that excavation was to begin, Environmental staff came to the site and flagged the bushes which were protected.

Based on his own measurements, Mr. Thibeault reasoned that if the UST was eight feet in diameter and buried 40 feet under, the north edge of the tank would be approximately five feet from the bottom of the ¾-to-one slope once the top of the tank was reached. On that basis he determined that, without using the restricted area off to protect the manzanita bushes, there would not be enough space to adhere to the slope ratios selected and still have the minimum working area needed at the bottom of the excavation to extract the UST.

Sergent then, on October 18, 1990, in a written memorandum to Joseph Eversole, the contracting officer ("CO"), formally sought a lifting of the restrictions caused by the fencing. This request, in effect, sought permission for removal of about 75 feet of chaparral near the site, encompassing some of the restricted area, in order to provide the minimum work and storage space needed.

On the same date, Mr. Meyer took a representative from Environmental to the site to review the problem of the restrictions caused by the presence of the bushes and to determine whether or not to give Sergent permission for clearing of a larger area around the excavation. Also on that date, Jay Burgner, Vandenberg's contract administrator, wrote a file memorandum in reference to Sergent's request to remove chaparral at the site. The memo stated that Sergent had not been able to get a decision from Environmental and Vandenberg's Missile Engineering Branch ("Missile Engineering") about removal of about 50 feet of chaparral from an area needed for stockpiling, that Mr. Meyer either misunderstood or neglected his responsibility with Environmental on the issue of bush removal, and, further, that the Mr. Eversole was informed about this.[6]

---

5. Shagbark manzanita is just one of several species of manzanita bushes which were present near the site. The shagbark bush, at maturity, does not grow much beyond six feet in height and only reaches a circumference of six to eight feet. During the court's site visit, the court could distinguish between shagbark manzanita bushes and others of the same family of plants only by lifting up the leaves and examining the unusual looking bark on the trunks of a few of the various bushes growing on the south side of the perimeter fence. The foliage of the several other species of manzanita plants present at the site had approximately the same color and leaf size and

the same dimensions. The court's inspection of these bushes revealed no other readily visible differences.

6. The memo states, in part, as follows:

"Then called [Environmental] ... talked with Msgt Coolidge who stated Ed Meyer was in his office over a week ago with drawings explaining the environmental issue on the brush around the job site. Ed was to coordinate further with [Environmental], the Contractor and us but apparently never did. As a result, the Contractor (Dick Thibeault) was left hang-

On October 19, 1990, Sergent notified Mr. Burgner that, as a result of the restrictions imposed upon the site in order to protect the manzanita bushes, excavation in accordance with the original plan would not be possible. Because the restricted area was unavailable for the stockpiling of excavated material or machinery, the UST could now be reached only by using a steeper slope than anticipated; consequently, the slope that would be needed would not meet the safety requirements for an open-pit excavation. Mr. Thibeault formally sought a meeting with the CO and other involved government personnel to discuss the problem.

Mr. Eversole, the CO, wrote an internal memorandum on October 22, 1990, pointing out that Environmental representatives were at the site on October 19, 1990, that the area remaining for stockpiling was insufficient and that to work around the protected bushes "would cost the government over $10,000." Also, the memorandum stated that "it will be necessary for your office and the using organization to assess the cost impact of working around the ... bushes." Pl.Ex. 22. On the same date, Mr. Eversole met briefly with Sergent representatives to discuss the environmental restrictions. Mr. Thibeault testified that, at this meeting, Mr. Eversole admitted that the manzanita bushes represented a changed site condition and that Mr. Eversole later reversed himself and advised Sergent that he would not issue a change order. Predictably, Mr. Eversole's recollection of this discussion is different; he testified that he had only agreed to "evaluate" Sergent's position and that he inquired about costs only because he foresaw a need to request funding in the event that he agreed with Sergent's position on entitlement.

On October 23, 1990, Sergent uncovered a large metal pipe on the north slope of the excavation at about the 24–foot level. The pipe, which was a 36–inch air ventilation or entrapment pipe, ran parallel to the launch control building and capsule. The air pipe was not a lightweight duct but a metal pipe which funnelled fresh air into and exhaust from the launch control building and capsule. It was constructed in such a manner as to provide protection against a nuclear blast shock wave. The pipe was shown on Drawing M–7 in the plans and specifications, but what was not shown was that the pipe was actually in two parallel sections which were connected at one end. One section passed closer to the tank and was lower than the other section. Apparently, the pipe section closest to the buildings is the one that looped back over the capsule.

Mr. Thibeault immediately gave written notice of this discovery to Mr. Eversole. The notice stated that the pipe appeared to be above the UST and that Sergent had concluded that it would be necessary to substantially enlarge the excavation in order to reach the buried tank, which the contractor still believed was 40 feet below grade. Although there was no distance shown on Drawing M–7 for the gap between the pipe and the UST, the pipe is shown as being above and between the capsule and the launch control building and, to a limited extent, superimposed over the capsule. But the distance from the launch control building to the UST is shown on Drawing M–7 as 10 feet. Because of the relative positions of the UST and the air pipe as shown on Drawing M–7, Mr. Thibeault erroneously determined, by extrapolation, that the plans were wrong and that the excavation required expansion to the south by about 10 feet to expose the tank and still allow sufficient level working room at the bottom of the excavation.

On October 24, 1990 one or more government inspectors went to the site and apparently observed some dirt falling on the north slope. On the basis of this observation, the inspectors summoned Mr. Eversole to the site and recommended that the excavation be stopped immediately. During this inspection, neither Mr. Eversole nor any of the inspectors present took any measurements of

ing without an answer to his request. I was then referred to Sara Berry ... at [Environmental] who told me over the phone that *the Contractor could not disturb any vegetation at* the site. *I advised her that the Contractor may claim delay costs for extended overhead if a solution isn't worked out on where to put his excavated soil....*" (Emphasis added.)

the angle of the slopes on either the north or south side of the excavation.[7]

On October 24, 1990, after Sergent had begun to enlarge the bottom of the excavation, Mr. Thibeault left the construction site for about three hours, leaving another manager in charge. When Mr. Thibeault returned to the site he found that his workmen had cut into the one-to-one slope on the south side and, according to Mr. Thibeault, "were getting a wall." At that point, to protect the workmen who were at risk, Mr. Thibeault stopped all work. By then, the excavation had reached close to the brush line on the south side. Sergent now had an insufficient working area between the brush and the edge of the excavation for equipment operations. Thus, without going into the restricted area and removing or replacing the manzanita bushes, Sergent could not reslope the south slope and return it to a one-to-one slope, or an acceptable safe slope ratio, before going forward with the excavation at the bottom of the pit.

Mr. Thibeault testified that, after ordering his workers to stop, he immediately went to Mr. Eversole to report the safety problem and to notify him that he had ordered his crew to stop work because of it. Mr. Eversole denied that Mr. Thibeault came to his office at this time to discuss the need to stop the work, but both parties agree that during that visit Mr. Eversole then handed Mr. Thibeault a written stop-work order, Pl.Ex. 29.[8] Mr. Eversole said that his decision to issue the stop-work order was based on his visual inspection and the opinions of others. He had concluded that the launch control building was being perilously undercut on the north slope, that safety rules were being violated (because the slopes appeared greater than the excavation plan allowed), and that the site was therefore "unsafe." [9]

About this time Sergent also requested authorization for overtime work because of the approach of the rainy season and the inherent risks of an open pit. Because all work was stopped at LCF–01E, Sergent also asked for release of another site, LF–05, in an effort to mitigate its damages resulting from the suspension at LCF–01E. After consultations with Missile Engineering, Mr. Eversole denied this request knowing that his denial would significantly increase Sergent's delay costs. Pl.Ex. 45, 46 and 47. Missile Engineering had objected to allowing the release of LF–05 because the contract allowed work at only one site at a time in order to maintain the maximum number of sites in an "operational status" to meet mission requirements and because Missile Engineering believed that Sergent's work performance to that date had not been adequate (as stated in an internal memo dated November 13, 1990 written by Brian Drake, Chief of Missile Engineering Branch). Pl.Ex. 47. However, that memo indicated that it was not a necessary requirement that the work be completed by the contract's completion date of December 16, 1990, and that a completion date of January 10, 1991, would suf-

---

7. Glenwood Peterson was one of these inspectors. During his cross examination, it became apparent that he did not comprehend what a ¾-to-one slope ratio (the allowable slope on the north side of the pit) actually meant. He thought "you went down a foot and come out ¾ of an inch." Tr. 738. Such a slope ratio, however, would be an almost vertical cut. Mr. Eversole exhibited similar difficulty with the definition of a ¾-to-one slope during his cross-examination. Tr. 635–36.

8. The stop-work order read in part as follows:
 1. You are hereby directed to suspend all work effective immediately as called for in the above contract. This suspension is due to a total disregard of safety conditions, specifications and contractual clauses.
 2. Specifically, your firm has allowed your work crews to operate heavy equipment in an excavation that needs to be heavily shored and braced. Safety violations that were determined to endanger your work forces and Government facilities were observed by the Contract Surveillance Inspectors, Ground Safety and the Contracting Officer.
 3. Until the safety violations are corrected and approved by the Contracting Officer, your firm is not to continue with work on LCF–01E.

9. After receiving the stop work order, Sergent attempted to backfill a part of the site, believing it was necessary to do so to stabilize the excavation and make it less hazardous to buildings and people while work was suspended. However, a government inspector stopped this operation, believing it to be a violation of the stop-work order. Thus, as a result of the inspector's direction, a condition which both parties agreed was hazardous was left unremedied for several weeks.

fice. Sergent was not shown this document or told of the later acceptable completion date. On October 31, 1990, Mr. Eversole denied Sergent's earlier request (of October 22, 1990) for approval of overtime work.

On November 2, 1990, Mr. Eversole directed Sergent to take immediate action to bring the work site into compliance with all applicable safety regulations and contract specifications. Tr. 625; Pl.Ex. 38. Sergent responded, indicating its concern with Mr. Eversole's direction that Sergent take instruction from the contract surveillance inspector when his previous instructions had been to only take direction from him, the CO. Pl.Ex. 39 and 40. By November 5, 1990, Sergent still had received no written direction from Mr. Eversole.

Sergent sent another letter on November 7, 1990, notifying the CO that the restricted areas would not permit the slope to be maintained to the south and that the restriction would be treated as a differing site condition. Also on November 7, Mr. Eversole wrote a letter indicating that sheeting, shoring and bracing would be necessary on the north side, citing U.S. Army Corps of Engineers Safety and Health Requirements Manual, Section 23.A.14 and contract Specifications, Section 2F, paragraph 7. Pl.Ex. 42. His letter further stated that if the unrestricted work area was not sufficient to allow enough room for continuation of excavation with a sloped method on the south side for a proper range of repose, then the same shoring method would be required on that side as well. *Id.* Mr. Eversole's letter imposed a deadline of November 9, 1990, for submission of a comprehensive shoring plan. *Id.* At Sergent's request, he granted an extension until November 16, 1990, and the initial plan, Pl. Ex. 43, was submitted on that date.[10]

Upon receipt of the shoring plan, Mr. Eversole issued a cure notice, which was sent after Missile Engineering advised him that the plan was incomplete since there were a number of omissions and exceptions. Pl.Ex. 49. The notice threatened Sergent with default if a suitable plan was not presented within five calendar days.[11] Sergent then obtained and submitted a shoring plan prepared by Cannon–Bart, a qualified shoring contractor, which was also immediately disapproved by Mr. Eversole. On November 19, 1990, Sergent supplied more information and a revised plan from Cannon–Bart.

On November 23, 1990, Mr. Eversole gave his approval of the Cannon–Bart shoring plan. A letter dated November 26, 1990, formally lifted the work suspension, subject to proper backfilling, so that Cannon–Bart could proceed. Mr. Eversole finally approved Sergent's request for overtime on November 30, 1990.

On December 3, 1990, in drilling a number of deep holes on the north side of the excavation needed for the steel piles, at approximately the 36 foot level, Cannon–Bart struck an obstruction which was determined to be an air pipe. Pl.Ex. 73; 130D and E. It is not clear whether the pipe was shown on the as-built drawings which defendant claims were then brought to the site by Mr. Meyer. The drawings had not yet been provided to Sergent. Because of the lack of space between the duct and the tank, the shoring plan had to be revised. The shoring contractor was forced to deviate from the approved plan and drill a number of 18–inch holes in place of 24–inch holes for the pilings in this area at added cost and expense. However, by reducing the piles from 24 to 18 inches, Cannon–Bart was able to bypass the obstruction. After drilling to a depth of 46 feet, ground

---

10. *The basic sequence of work involved backfilling of the pit to a depth of 20 feet, resloping the sides as needed to a one-to-one ratio, recompaction, drilling of 40 foot holes positioned on three sides of the pit to a depth well below the tank, placement of vertical steel piles into a slurry mixture of sand and cement, installation of vertical braced shoring plates as the excavation proceeded to the tank's level (except that the plan contemplated that the ramp on the west end of the excavation would be shored increasingly as the descending walls' height increased).*

11. *The court notes that the government had known for some time that completion was not required until January 10, 1991, yet at the same time it was insisting upon adherence to the contract's December 13, 1990, completion date and concomitantly denying Sergent's requests for overtime. The cure notice placed plaintiff under the added stress of a possible default.*

water began to collapse the holes. To remedy this problem it was necessary to place 18-inch sleeves into the holes, fill them with slurry, and redrill them.[12] The water, however, was well below the UST. It would not have interfered with the excavation of the tank except for the requirement for deep piling for the shoring. At this point, coffin-box shoring was no longer needed at LCF-01E because of the more extensive vertical shoring system that was used at that site.

At this point, even the government was uncertain as to the exact location of the UST. This resulted in a direction by Mr. Meyer and Missile Engineering to drill extra test holes not called for in the approved shoring plans, to determine the location of the UST. Cannon–Bart followed this direction. This drilling for the first time resulted in a determination that the UST was closer to the launch control building than was shown on the plans. The installation of 18-inch pilings resulted in the need for extra pilings to obtain the same strength afforded by the larger pilings on the east side of the excavation. The pipe that was struck during the drilling process later proved not to be 4½ feet from the north edge of the UST but only 18 inches, which barely allowed for 18-inch holes between the pipe and the UST. Tr. 194. Thus, later excavation work confirmed that the tank was actually approximately three feet closer to the pipe than was shown on the government's plans and drawings (and hence also that much closer to the capsule and launch control building).

The excavation was further delayed by the government's need to internally modify the capsule. Finally, because of the obvious risks of having an open excavation, the Air Force agreed to allow the work to be accelerated and to extend the completion date to January 10, 1991. Pl.Ex. 105.[13]

On December 20, 1990, Sergent, as a result of a Freedom of Information Act request,

finally obtained a copy of the as-built drawings. On December 21, 1990, Sergent notified the CO of the changes that Cannon–Bart had to make in the placement of the piles due to the newly discovered actual location of the UST. All work at LCF–01E was completed on January 10, 1991. After a final inspection of the site, the Air Force accepted the work on January 11, 1991. Pl.Ex. 117.

Sergent's claims for damages for costs and delays at this site were filed in certified form on April 16, 1991, and were denied by Mr. Eversole on August 6, 1991.

### B. *Contentions of the Parties.*

Sergent contends that there were eleven subsurface or latent physical conditions at LCF–01E which materially interfered with the work, including buried communication cables, antennae, air vents, vent ducts, telephone pole and electrical conduits, a concrete lined drainage ditch thicker than shown on the plans, a gate, septic tank leach fields, the oil tank's location, a large elevated manhole and, most importantly, omission of any reference to any purportedly endangered plants in the vicinity of the site. Sergent contends these conditions would not have been discoverable prior to excavation. Further, Sergent maintains that, either individually or collectively, they caused Sergent to incur additional costs.

Sergent also contends that under the contract's Suspension of Work Clause, it is entitled to recover for the unreasonable delays that the government caused at this site. Sergent contends that the government's stop-work order and the resulting delays were unreasonable because an open-pit excavation method would have safely and inexpensively allowed the contractor to extract the tank. Sergent says that the approved excavation plan was entirely reasonable, that it was prepared by a "competent person," and that its sufficiency should be judged by

---

12. This work was done without any assistance or direction from government personnel.

13. Previously, on November 26, 1990, Mr. Thibeault had written a letter to Mr. Eversole summarizing the parties' discussions at a meeting held on that date regarding the shoring plan and its implementation. As of the date of this letter

Sergent was still under the impression that the scheduled completion date of December 13, 1990, was critical to its satisfactory performance of the contract at this site. The letter also notes the government's refusal to provide the as-built drawings and to approve overtime work.

the fact that the same type of open excavation plan, with comparable slope ratios, worked well (and without quarrel) at the other 15 sites, two of which also had tanks buried at 40 feet.

The contractor encountered difficulties and potential hazards at the site, Sergent argues, because the government unreasonably restricted the area which could be used for the placement of excavated dirt and equipment. Such a restriction was unreasonable, in Sergent's view, because it was based on a mistaken belief that the shagbark manzanita was a protected plant species; in fact, the shagbark manzanita was not protected.[14] Pursuant to the contract, Sergent argues that it could have easily moved or replaced the plants at the end of the project. Moreover, the government's environmental restriction was not revealed to the contractor until the day before Sergent started work at LCF–01E.

Defendant asserts that its insistence upon vertical shoring at LCF–01E was justified because of the hazardous conditions created by Sergent's over-excavation, which the government contends was solely the responsibility of plaintiff. Defendant also contends that vertical shoring of the excavation was necessary—and, thus, required by the contract—because the tank at LCF–01E was more than 20 feet underground and relatively close to the launch control building. Based on these factors, defendant's position is that Sergent should have planned on using vertical shoring at LCF–01E when it formulated its bid. The government further contends that the restrictions imposed on the contractor to protect the manzanita bushes ultimately did not contribute significantly to the government's decision to require vertical shoring because such a shoring system would have been necessary in any event.

Defendant contends that Sergent should have determined for itself exactly where the tank was before going forward with the excavation as a part of its "field verification" as required by the contract.[15]

### C. *Analysis.*

As discussed earlier, the contract sets forth the two categories of differing site conditions provided for in the FAR. The first category (Type I) concerns "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract"; the second category (Type II)

---

14. On February 21, 1990, the U.S. Fish and Wildlife Service published a notice in the Federal Register listing the status of various plant species which were held or suspected to be endangered or threatened. The notice designated the shagbark manzanita as a "category 2" plant. 55 Fed.Reg. 6184, 6188 (Feb. 21, 1990). Category 2 is defined in part as follows:

> Taxa for which there is some evidence of vulnerability, but for which there are not enough data to support listing proposals at this time.... Further biological research and field study usually will be necessary to ascertain the status of the taxa in category 2, and some of the taxa are of uncertain taxonomic validity.... The Service hopes that this notice will encourage necessary research on vulnerability, taxonomy, and/or threats for these taxa.

Id. at 6185. As the above language demonstrates, the government in 1990 had insufficient information on which to base a decision to designate the shagbark manzanita as an endangered or threatened species. It is reasonable to conclude, therefore, that the Air Force was under no obligation in 1990 to take extraordinary steps to preserve a particular shagbark manzanita bush.

15. In its post-trial brief, defendant also argues that, at trial, Sergent raised new facts and theories to support its differing site condition claim which were never presented to the CO. Specifically, defendant objected to plaintiff's evidence concerning the 36″ air duct, which plaintiff discovered to be oriented differently in relationship to the UST than indicated on the contract documents.

Plaintiff argues, in response, that the evidence concerning the air duct was offered not as a separate claim, but rather in support of plaintiff's overall differing site condition claim. Moreover, plaintiff points out the claim filed with the CO concerning LCF–01E referred to earlier written submittals made to the CO which explicitly alerted Mr. Eversole to the discrepancy.

The court accepts plaintiff's explanation of its purpose in presenting evidence concerning the air duct, noting that the orientation of the air duct became a material complication in the project only when the contractor was attempting to install vertical shoring and hit the unknown obstruction which turned out to be the air duct. The obstruction required a minor reconfiguration of the vertical shoring system designed by Cannon–Bart. Consequently, the discrepancy between the contract documents and the actual site condition is merely an element included in plaintiff's shoring claim, not a separate claim requiring an initial decision by the CO.

concerns unknown or unusual physical conditions at the site which are different from those ordinarily encountered and generally recognized as inhering in the kind of work which is the subject of the contract. Sergent has alleged that Claims 1.A and 1.B are of Type I.

■■■ To prevail on a Type I differing site condition claim, a contractor must first prove by a preponderance of the evidence that "the conditions 'indicated' in the contract differ materially from those it encounters during performance." *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984); *see also Arundel Corp. v. United States*, 207 Ct.Cl. 84, 105, 515 F.2d 1116, 1128 (1975). A material discrepancy between what is indicated in the contract documents [16] and what is encountered at the site can result in unanticipated costs to the contractor, for which the government would be liable. However, conditions which are discoverable by a reasonable site visit and review of the contract documents would be chargeable to the contractor. Cibinic & Nash, *Administration of Government Contracts* (1986) at 379; *see also Dayton Constr. Co.*, HUDBCA 82–7466–C34, 83–2 BCA ¶ 16,809 (1983). In other words, to be a Type I condition, it must be "reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding." *Mojave Enter. v. United States*, 3 Cl.Ct. 353, 356–57 (1983).

Defendant argues that plaintiff at trial failed to meet its burden of proof to establish a Type I condition at LCF–01E. In the first instance, defendant argues that plaintiff failed to show that the contract documents indicated that the site conditions were materially different from what plaintiff actually found. Defendant further argues that plaintiff failed to prove that it acted as a reasonably prudent contractor in interpreting the

contract documents or, more specifically, in preparing its bid. In a similar vein, defendant argues that plaintiff also failed to carry its burden to prove that it reasonably relied on the indications in the contracting documents or that the conditions actually encountered at the site were unforeseeable.

Defendant is correct regarding the burden on plaintiff to establish what the contract documents indicated were the site conditions. However, plaintiff presented uncontradicted testimony that the contract documents erroneously indicated the location of the underground storage tank at LCF–01E, and that plaintiff did not and could not have discovered the tank's true location prior to the excavation because Sergent was never shown an accurate drawing of the site—*e.g.*, the as-built drawings—until after the instant dispute erupted. Plaintiff also presented uncontradicted testimony that the contract documents never indicated that the chaparral adjacent to the site was protected by environmental regulations, nor did the contract documents indicate that the area available at LCF–01E for the placement of equipment or excavated dirt would be restricted.

Plaintiff's expert, William Boyd, testified that, if there had been protected plant species in the vicinity of a site which is the subject of a contract, the Air Force would have been obligated to apprise the contractor of that fact as early as possible. In this regard, plaintiff's expert opinion concerning the Air Force's obligations was also uncontradicted. In the present case, Sergent showed that it learned of the Air Force's concern for the shagbark manzanita no earlier than a day before work at LCF–01E was to begin, though contract inspectors and Environmental personnel had discussed the specific problem of the manzanita bushes near LCF–01E at least 10 days earlier.[17]

---

16. "Contract documents," for the purpose of this clause, includes the following: all documents; materials referred to in the bidding documents; any notes thereto including geologic reports, soil surveys and the like which are referred to therein; and discoverable physical conditions at the site.

17. Moreover, defendant imposed no restrictions on storage of excavated materials at any of the

other sites already completed. Finally, after some mobilization but before any excavation was begun, defendant imposed restrictions on an area near the site to protect shagbark manzanita bushes. Therefore, as soon as it had notice of the defendant's position regarding the effect of the bushes, plaintiff objected in writing to defendant's restrictive actions. Sergent's actions occurring prior to the time of dispute, although subsequent to preparation and submission of its

■ Binding case law supports the proposition that when the government possesses material information which would affect a contractor's performance and fails to disclose that information even though the government has no reason to believe that the contractor could obtain it from another source, such nondisclosure may constitute a breach of contract. *American Ship Bldg. Co. v. United States,* 228 Ct.Cl. 220, 225, 654 F.2d 75, 79 (1981); *Hardeman–Monier–Hutcherson v. United States,* 198 Ct.Cl. 472, 487–87, 458 F.2d 1364, 1371, (1972); *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 444, 312 F.2d 774, 778 (1963).

■ In the present case, nobody informed plaintiff about the manzanita bushes until the day plaintiff was to begin work or, possibly, a day earlier. Defendant even admits that it had an obligation to inform plaintiff about the site restrictions earlier than the day before work was to begin, and that it failed to do so.[18] The court finds no excuse for the government's failure to disclose the potential restrictions on LCF–01E in a timely manner. Even if the government had been correct in its belief that the manzanita bushes were protected by law, the contractor would still have had no reason to know that its work at LCF–01E would be hindered. Thus, through fact and expert testimony, plaintiff has persuasively shown that it could not have anticipated the actions the government took to protect the manzanita bushes—actions which were unreasonable in light of the fact that the plants were not protected by any environmental law or regulation. Aside from pointing to language in the contract stating that the contractor had to comply with applicable environmental regulations (of which there were none with respect to shagbark manzanita), defendant has failed to explain why Sergent should have been prepared for the restrictions which were imposed.

Based on the foregoing reasons, the court concludes that plaintiff has met its burden of proof concerning what the contract documents' "indications" were. Certainly, plaintiff has based its arguments not so much on what the affirmative indications of the documents were, but more on the fact that the documents omitted crucial information which affected the contractor's performance. The primary omission was the Air Force's failure to give the contractor timely notice of the restrictions it would impose to protect the manzanita bushes. That misbegotten restriction prevented Sergent from pursuing its original plan of excavation in a safe manner, resulting in the Air Force's decision to issue a stop-work order and to require vertical shoring. Moreover, it was only because of those circumstances that most of the other alleged added costs and differing site conditions, such as the mislocation of the storage tank and the configuration of the 36" ventilation duct, gained significance.

Neither the language of the contract itself nor the language of the OSHA regulations which the contract incorporates specifically imposes a requirement for vertical deep-pile shoring on an excavation similar to the one which plaintiff originally set out to accomplish—*i.e.,* an open pit with sloped sides. The court finds, based on the testimony of the parties' fact witnesses and experts, that Sergent's original excavation plan was a reasonable one given all relevant conditions at the site, including the soils present, its past general experience and expertise in tank excavation, and its experience in performing this contract. Plaintiff's original, approved plan to excavate the tank at LCF–01E with an open-pit excavation method and coffin-box shoring could have been accomplished safely and effectively if Sergent had been given adequate space in which to excavate and to

bid are "highly relevant" in determining the parties' intentions and interpretations. *Dynamics Corp. of America v. United States,* 182 Ct.Cl. 62, 73, 389 F.2d 424, 430–31 (1968); *Northbridge Elect., Inc. v. United States,* 175 Ct.Cl. 426, 438, n. 8, 1966 WL 8866 (1966).

18. The contract provides, at ¶ 17.1.2 of the technical specifications, as follows:

*"Environmental Monitoring.* All construction activity performed on Vandenberg AFB is subject to the National Environmental Protection Act where the work pertains to critical habitat of vegetation and wildlife. The [base Environmental Task Force] *will annotate the construction permits where such conditions exist and will brief the environmental requirements.* The permit will indicate that the briefing was given...." (Emphasis added.)

place excavated material and equipment while working. By the time it began work at LCF–01E, and pursuant to the same contract and plan, Sergent had already successfully excavated two other tanks which were at similar depths without using vertical shoring. Both plaintiff's project manager, Mr. Thibeault, and plaintiff's trial expert, Mr. Boyd, had experience with deep excavations similar to the one at issue, and both testified persuasively that Sergent's open-pit excavation plan was feasible. Even defendant's expert, Jack Rolston, who testified that plaintiff's original shoring plans were inadequate, admitted that plaintiff's plan to use a sloped excavation without vertical shoring was feasible, albeit risky. Mr. Rolston also revealed that, unlike Mr. Thibeault and Mr. Boyd, he had no personal experience in deep excavations similar to the one at issue.

Both parties agree that on the day that the stop-work order was issued, conditions at the site were unsafe, owing in part to over-excavation by Sergent's workers. Mr. Thibeault testified persuasively, however, that the over-excavation resulted from the severely restricted area which the workers were given for the placement of dirt and equipment. The danger created by the over-excavation could have been remedied by allowing the contractor access to the area of the manzanita bushes, but such access was unreasonably denied.[19] Defendant contends that the stop-work order was issued for safety reasons alone, but the testimony of defendant's own witnesses, as well as the contemporaneous documentation of these events, contradicts defendant's contention. The evidence shows that the safety problems, such as they were, were inextricably the result of the government's unreasonable refusal to allow Sergent complete access to the areas surrounding the site.[20]

Furthermore, the evidence presented to the court also persuasively indicates that the vertical shoring system which the Air Force required Sergent to install as a condition of lifting the stop-work order was far in excess of what would have been necessary in order to remedy the immediate safety problem, even given the limitations imposed to protect the bushes. The decision on the part of the CO to require vertical shoring appears to have been based more on an overabundance of caution than on the relevant experience or knowledge of the CO or his associates. The CO and other Air Force personnel testified that they believed, based on their visual observations of October 23, 1990, that the excavation was endangering Sergent's workers and nearby buildings. None of the persons involved in making the decision to require vertical shoring, however, ever took measurements of the site or the slope, and none had any substantial experience in deep excavations.[21]

Based on the testimony of witnesses who contemporaneously viewed the site and the

19. The court declines to speculate as to whether the Air Force's actions would have been reasonable if the shagbark manzanita bushes had been, in fact, an endangered plant species. Such a fact would not necessarily have warranted the specific action taken by the Air Force in the present case, i.e., a total prohibition against disturbing the plants. Alternative methods of protecting the plants were possible—such as temporarily moving and subsequently replacing them. Moreover, the court must emphasize that the status of the shagbark manzanita as unendangered as of 1990 is not the sole basis for the court's conclusion. The court was also troubled by the fact that no notice of the restriction was given by the Air Force until the day or the day before Sergent's crew was to start work.

20. The court also notes that some of Mr. Eversole's statements are in conflict with defendant's position in this case. For example, he admitted during cross-examination that environmental issues were involved in the dispute and that the work stoppage was not caused solely by a safety problem. Tr. 607–08 and 625. He also admitted that the base Environmental staff "were not as up on things on this contract as they should have been...." Tr. 583. Further, "[Environmental staff] kind of went from kindergarten to college on the way everything happened environmentally and interfaced with the base." Tr. 681.

21. The court was particularly troubled by Mr. Eversole's callow explanation that his estimation of the hazardousness of the excavation was based on two factors, the first being his observation of some loose rocks and soil at the pit. The second factor was his recollection of a fatal cave-in incident which he knew of but did not personally witness in his previous experience as a contract administrator at another Air Force base. The incident which Mr. Eversole described did not involve an excavation at all similar to the one undertaken by Sergent in this instance. Tr. 560.

testimony of the parties' expert witnesses, the court is convinced that there was no area of any appreciable size on either the north or south slope which exceeded the ¾-to-one slope which was allowable under the OSHA Manual. Further, the court finds that although for a short distance, beginning at a point about five feet from the closest corner of the launch control building, there was a vertical drop of about five feet which extended horizontally for about 15 or 20 feet, but there was no undercutting of the foundations of the launch control building that would have materially threatened its structural integrity. This conclusion is inescapable when consideration is given to the building's light weight and the added support provided both by the buried capsule and the double air pipes, which rested under the launch control building but above and between the tank and the launch control building. Nor was there credible evidence suggesting a danger to workmen from a caving of the north or south slope at that time. It is true that, at the time of issuance of the stop-work order, there was on the south side of the excavation (i.e., the side opposite the building) a concave area, reaching up from the bottom of the pit for an undetermined distance which was steeper than what was allowable under the OSHA standards. Mr. Thibeault testified as to his belief—supported by expert testimony—that the over-excavation in this area could have been remedied merely by backfill-

ing and recutting the slope.[22] No evidence was presented, however, showing persuasively that any part of the north slope (i.e., the side of the excavation adjacent the building) actually exceeded a ¾-to-one slope.[23]

■ With regard to defendant's argument that plaintiff's claim should fail because Sergent did not introduce evidence at trial showing that its bid was reasonable, the court is unconvinced that prior cases cited by defendant would impose such a requirement in the instant case. Defendant cites a number of cases imposing on a contractor the burden to show that he acted reasonably and prudently in interpreting and relying on the representations made in the contract documents: *P.J. Maffei*, 732 F.2d. at 917; *Weeks Dredging and Contracting v. United States*, 13 Cl.Ct. 193, 218 (1987), *aff'd*, 861 F.2d 728 (Fed.Cir. 1988) (table); *Youngdale & Sons Constr. Co. v. United States*, 27 Fed.Cl. 516, 528 (1993). This court does not reject the notion that a contractor should not be rewarded if he has failed to act reasonably and prudently when entering into a business transaction with the government. Nonetheless, the court finds nothing in the cases cited by defendant suggesting that a plaintiff cannot prove reasonable reliance without presenting evidence of how it reached its bid. When a contractor is pursuing damages on a total-cost basis, then the reasonableness of plaintiff's bid is an essential factor for the court to consider

---

22. In the court's view, Mr. Thibeault's testimony—and, indeed, his credibility—was .considerably strengthened by the fact that his contemporaneous judgments and observations were based on his many years of experience in construction projects involving difficulties similar to those involved in this contract. His experience, moreover, included many years working in government contracting in both the public and private sectors.

By sharp contrast, none of the Air Force personnel who contributed to the CO's decision to issue the stop-work order and to require the contractor to install vertical deep-pile shoring at LCF–01E appear to have had similar relevant experience or knowledge related to construction projects involving deep excavations. Although such knowledge or experience is certainly not a job requirement for the military officers and bureaucrats who administer public contracts, the lack of it in this instance weakened the testimony of defendant's fact witnesses regarding how they perceived and evaluated the site conditions at the

time the stop-work order was issued and thereafter.

23. At trial defendant introduced photos purporting to depict the excavation on the date that the stop-work order was issued. Def.Exs. 35(a) and 35(b). Defendant's expert testified that these photos supported defendant's uncontested position that the site was hazardous due to overexcavation. Notwithstanding defendant's expert's testimony, however, these photos reveal nothing that would help the court determine whether the vertical shoring required by the Air Force was necessary. Specifically, the photos do not reveal the angles of the slopes depicted, the angle of the sun (i.e., the time of day that the photos were taken), the distances between the camera and the features shown in the photos, among other things. Defendant's counsel could not even identify who took the photos, though they were probably taken by one of the inspectors or by the contracting officer on the morning of the day the stop-work order was issued.

when evaluating *damages.* *Youngdale,* 27 Fed.Cl. at 542 (citation omitted). However, the court's concern in the instant case is solely with liability, not damages.[24] Because damages were the subject of a pre-trial joint stipulation, the court does not need to inquire into the reasonableness of the amounts to which both parties have agreed plaintiff is entitled in the event of a finding of liability.

Further, although Sergent presented no evidence specifically addressing the assumptions it made when calculating its bid, the court finds that such specific evidence would have been superfluous. Plaintiff has established that it bid on a fixed-price contract which included 16 separate projects. Among these were three deep excavations of USTs, of which the one at LCF–01E was the third. Plaintiff demonstrated that it planned, from the beginning, to excavate these tanks using a sloped, open-pit method with coffin-box shoring, and so by inference that method was the basis of its bid. Defendant has not disputed Sergent's testimony that its original bid had allocated approximately $6,000 in total shoring costs for LCF–01E. Tr. 339. Moreover, the court has already concluded that the planned excavation method was reasonable.

■ The court also finds that plaintiff's failure to conduct an adequate pre-award site visit to LCF–01E is unavailing to defendant, at least with regard to the restrictions imposed on the contractor to protect the manzanita bushes. The testimony of both parties makes clear that the contractor could not have known about such limitations prior to bidding. A site condition which could not be discovered through a pre-bid site visit by a reasonably prudent contractor can still give rise to a differing site condition claim. *Ser-*

*vidone Construction Corp. v. United States,* 19 Cl.Ct. 346, 374 (1990), *aff'd,* 931 F.2d 860 (Fed.Cir.1991).

Similarly, certain other discrepancies between the contract documents and the actual conditions could not have been discovered through a pre-award site visit by a reasonable and prudent contractor. Specifically, the fact that the underground storage tank was erroneously indicated on the plans as 40 feet deep—it was actually 36 feet deep—and the plans indicated that it was horizontally 3.5 feet further away from the launch control building than it actually was. In addition, there were buried communication cables which restricted Sergent's bulldozer operations, there was a septic tank leach field to the west of the launch control building, and the buried conduit elevations were improperly shown on the plans.

For the reasons discussed above, therefore, the court holds in favor of plaintiff with respect to Claims 1.A and 1.B. Based on the joint stipulation of October 12, 1993, plaintiff is entitled to $392,635 with respect to these claims, with CDA interest to be computed from April 16, 1991.

### Claim 1.C

Another work stoppage at LCF–01E occurred on November 24, 1990, due to a leak in a PVC water line which was allegedly not shown on the plans. The line was located just beyond the entrance gate to the site. The rupture of this buried water line happened during Sergent's equipment operations and occurred at the commencement of Sergent's first excavations to create a slope into the excavation. The water in the pipe was under high pressure and was soaking the

---

24. In a supplementary post-trial filing, defendant also cites *Fruin–Colnon Corp. v. United States,* 912 F.2d 1426 (Fed.Cir.1990), arguing that it establishes that the contractor has the burden to prove its actual reliance upon a particular interpretation of the contract specifications at the time of its preparation of its bid. *Fruin–Colnon,* however, is inapposite to the present case. *Fruin–Colnon* concerned a contract specification which was interpreted differently by the contractor and the government. 912 F.2d at 1429. The Federal Circuit affirmed a board of contract appeals decision holding that the two competing interpretations of the specification were both rea-

sonable and that the specification was, therefore, ambiguous. Because of that ambiguity, the contractor's recovery hinged on proving that it relied on its own interpretation in formulating its bid; the contractor, however, had presented no evidence of its pre-performance interpretation of the ambiguous specification. Accordingly, recovery was denied. 912 F.2d at 1429–30. Although *Fruin–Colnon* is certainly good law, its requirement of specific evidence concerning how a contractor reached its bid does not apply to the present case because in the instant dispute plaintiff is not alleging an ambiguous contract specification, but rather a differing site condition.

site, creating an allegedly hazardous condition. The contractor's on-site project manager, Mr. Thibeault, promptly notified the Air Force of the discovery of the pipe and the need for immediate action—i.e., turning the water off and repairing the rupture. Plaintiff's crew was delayed for more than four hours while waiting for water to be turned off. According to a contemporaneous account of the incident written by Mr. Thibeault, the Air Force was unable to shut off the water immediately because it could not find the appropriate wrench. Pl.Ex. 130 at unnumbered page 15.

In considering the claim, the CO did not dispute that the differing site condition existed, and in fact Mr. Eversole agreed to compensate plaintiff for its direct costs. However, Mr. Eversole denied a substantial part of plaintiff's claim on the grounds that the inspector's log books allegedly showed that the claimed work delays were not necessary. Mr. Eversole admitted, however, that he had not examined the contractor's daily reports, submitted in support of this claim, but rather reviewed only the inspector's daily logs before making his decision to deny the delay claim. Pl.'s Ex. 127; Tr. 652–654.

In reaching a decision over a contract dispute, a contracting officer has a duty to be an "unbiased, impartial arbiter." *Wilner v. United States*, 24 F.3d 1397, 1412 (Fed.Cir.1994) (Bennett, J., dissenting) (citing 48 C.F.R. § 1.602–2 (1992)). At the same time, a contracting officer "must also be the guardian[ ] of the government's interests.... Consequently, a contracting officer's duty is to balance contradictory interests, placing that of the government at the fore." *Id.* Based on these general principles, in the present case the court does not fault Mr. Eversole for having accorded more weight to the positions taken by the Air Force with respect to Claim 1.C. Nonetheless, the court cannot countenance the CO's admitted failure to give any consideration at all to Sergent's arguments and exhibits. By reviewing only the records produced by the government, Mr. Eversole failed to fulfill his duty to be unbiased and impartial.

Taking into account the CO's breach of duty, the preponderance of the evidence supports the conclusion that Sergent is entitled to recover its delay costs with respect to Claim 1.C. Based on Mr. Thibeault's experience with deep excavations in general and with site LCF–01E in particular, his decision to stop work when leaking water was threatening to saturate the site appears to have been correct. Defendant, moreover, has declined to offer any justification for the fact that it took the Air Force more than four hours to turn off the water in the pipe that was leaking. In the court's view, the length of the delay in turning off the water was unreasonable, and the costs of that delay must be borne by defendant. Plaintiff is entitled to $1,706 with respect to Claim 1.C, with CDA interest to be computed from April 16, 1991.

### Claim 1.F

Among the tasks which needed to be completed in connection with the UST removal was the removal of certain conduit and wiring connecting the launch control capsule to an electrical power pole near the site. On or about October 19, 1990, Sergent struck and damaged the conduit while in the process of excavation; the contractor eventually determined that the damage caused by its equipment was irreparable, and the conduit and wiring would have to be replaced. Sergent immediately requested a meeting with the CO because the contractor believed that the damage to the conduit resulted from misleading indications in the contract drawings. The contractor had interpreted the drawings as indicating that the conduit ran horizontally from the power pole to the edge of the launch control building and then vertically to a switch next to the capsule. The contractor believed that the horizontal portion ran just a few feet below grade. In reality, the conduit ran diagonally downward from the power pole directly to the switch near the capsule. Sergent's machinery struck the conduit because the contractor was not expecting the diagonal configuration. The CO did not respond to the contractor's notification of these events until November 30, 1990.

Sergent then submitted a cost proposal on January 3, 1991, for $12,530.36, which was ignored by the CO. Thereafter, on April 16,

1991, it filed a certified claim, alleging a differing site condition based on what plaintiff believed was a discrepancy between the contract drawings and the actual configuration of the conduit. The CO denied the claim in its entirety on August 6, 1991. Through a contract modification, Sergent was eventually paid for the direct costs of the alterations but was denied recovery for all associated delay costs allegedly because there was other work Sergent could have done at LCF–01E during the delay, according to the inspector's logs.

Plaintiff contends that it could not have anticipated from a reasonable reading of the drawings that the conduit and wire dropped 40 feet diagonally from the power pole to the buried capsule. Mr. Eversole, prior to his denial of this claim, had not reviewed one of the pertinent drawings, E–1. He only reviewed drawings E–14 and E–15, which, in the opinion of his technical advisers, adequately depicted the configuration of the conduit. His reasons for denial of this claim was that the drawings, read together, properly showed the conduit's configuration. However, plaintiff counters that no drawing clearly shows the conduit extending at an angle from the power pole to the capsule.

■ The court agrees with plaintiff that the none of the contract drawings clearly indicates the true configuration of the conduit. Moreover, the court finds that plaintiff's interpretation of the drawings during performance was a reasonable one, since the configuration which Sergent had expected to find was more typical of those it found at Vandenberg sites it had worked on previously. Moreover, as noted earlier, plaintiff was not permitted to view the as-built drawings related to LCF–01E until long after discovering differing site conditions there. Thus, lacking the as-built drawings as a reference, the contractor could not have known the true configuration of the buried conduit before digging.

Accordingly, in the present case, the court finds that the preponderance of evidence supports plaintiff's position that the conduit's configuration was a Type I differing site condition. Plaintiff therefore prevails. Based on the October 12, 1993, joint stipulation, Sergent is entitled to $11,757 with respect to Claim 1.F, with CDA interest to be computed from April 16, 1991.

### Claim 1.H

■ Claim 1.H resulted from Sergent's replacement of a corrugated metal pipe culvert which extended under the roadway at the entrance to the site and which was not shown on the plans and specifications. Sergent discovered the culvert when its excavation equipment damaged it. Upon discovery of the culvert, Sergent thought it was reusable and intended to remove and simply reinstall it after completion of the tank excavation work. In removing the culvert, it was found to be too deteriorated to be salvaged. Sergent's contention is that the deteriorated culvert constituted a Type II differing site condition because its subsurface deteriorated condition was not of the type ordinarily encountered. Moreover, Sergent contends that such condition was not discoverable during a pre-award site inspection. The CO, Mr. Eversole, approved payment for Sergent's labor in performing the replacement work because the culvert was not shown on the plans, but he rejected Sergent's materials claim for a new culvert because, in his opinion, the culvert was clearly visible at the site.

The culvert was above ground and would have been clearly visible during a pre-award site visit. The claim submitted to the CO rested on the fact that the culvert was not indicated on the contract documents. Although there is no dispute that the culvert was deteriorated, plaintiff's evidence is insufficient to allow a finding that the replacement was not made necessary, in part, by plaintiff's own negligence. The evidence is also insufficient to determine the extent to which the deteriorated condition of the culvert was not discoverable during a pre-award site visit. Accordingly, no compensation is warranted with respect to this claim.

### Claim 4

Sergent seeks delay costs with respect to differing site conditions which it found at site LF–08. Specifically, on July 16, 1990, Sergent uncovered a concrete wave guide trench which the contractor was required to remove

as part of its work at LF–08; the contract documents indicated that the trench was nine inches wide. The trench, which has been described as a concrete U-channel, was indeed nine inches wide on top, but on the bottom of one side of the U there was a concrete-encased extension which made the total width of the trench actually about 30 inches; in other words, the shape of the channel was depicted on the contract documents as a U, but the actual channel was found to be more like a "pregnant" U. Tr. 332. The contractor stopped work upon this discovery, and Ernest Bentley, who preceded Mr. Thibeault in the position of project manager, testified that he and his workers did not wish to disturb the extended part of the trench until they got some guidance from the Air Force because they did not know what the extension contained. Based on his experience, Mr. Bentley suspected that extension contained electrical or communication cables. Tr. 334.

By letter dated July 18, 1990, the contractor notified the CO of this site condition. The following day, Sergent submitted a cost proposal, and the contractor continued to seek guidance over the next four weeks. Eventually, on August 13, 1990, Sergent resumed work and proceeded to remove the entire trench without direction from the Air Force. Mr. Bentley testified that he decided to proceed with the work notwithstanding the lack of guidance from the Air Force or the lack of a negotiated settlement about costs because the contractor was allotted only 45 days under the contract to complete the work at LF–08. TR. 339. Based on the problems Sergent was encountering in its negotiations with the Air Force over the conditions at LF–08, Mr. Bentley feared that the Air Force would not pay for an extension of the 45–day deadline. Tr. at 353. Work at LF–08 was scheduled to end on August 24, 1990, and work at the next site was to begin on the day after.

As part of a negotiated change order in March 1991, the CO agreed to pay for Sergent's direct costs related to the differing site conditions at LF–08 but refused to pay for delay costs. The CO's position was that Sergent had "walked off" the job, thus making the delay costs the responsibility of the contractor and not of the government. At trial, however, plaintiff offered unrebutted testimony that, at the time of the discovery of the 21–inch extension, only a few minor punch-list jobs remained to be done at LF–08 by the time Sergent's crews stopped working.[25]

Sergent contends the delay was warranted because of the importance of the site and its legitimate fear that if the excavation cut through a power cable in the trench, the launch control facility would not be functional. Without direction or authorization, Sergent finally cut into the trench and determined on its own that the trench contained no cables or wires.

■ After carefully considering the testimony of both parties' witnesses, the court concludes that plaintiff's decision to suspend work at LF–08 upon discovery of the 21–inch concrete-encased extension to the U-channel was both reasonable and correct under the contract. It was reasonable because the Sergent project manager's years of experience in excavations led him to the rational conclusion that the concrete tube might contain live electrical or communications wires, disturbance of which could pose a potential hazard either to Sergent's workers or to base operations. The fact that the contractor later decided, at its own risk, to end the suspension and remove the extension without any guidance or direction from the Air Force does not diminish the reasonableness of Sergent's initial decision to approach the matter with caution. By the time Sergent abandoned that approach, the contractor had only

---

25. On the stand, Mr. Eversole attempted to rebut plaintiff's assertion concerning the lack of other work remaining to be done at LF–08 at the time of the work stoppage by stating that other work remained to be done at the site, but he never even roughly identified the remaining work which Sergent could have performed, nor did he identify the specific inspector's logs on which his decision was purportedly based. Lacking such information, therefore, Mr. Eversole's testimony that other work could have been performed during the alleged delay period fails as rebuttal. Moreover, his contention that there were other tasks at LF–08 yet to be completed is unsupported by any contemporaneous records.

10 days remaining under the contract for the completion of all work at LF–08, and the contractor at that time had no reason to believe that the government would pay if the contractor was unable to abide by the schedule. Sergent's initial decision to suspend work was also reasonable because the contractor rationally believed that the Air Force would be helpful in determining what the mysterious encasement contained and whether it could be removed harmlessly.[26]

As for the correctness of Sergent's initial decision to suspend work, in light of the applicable contract provisions, the court's decision flows logically from the agreement by both parties that the existence of the 21–inch concrete extension at the bottom of the 9–inch U-channel constituted a differing site condition. Because it was a differing site condition, the contractor acted appropriately by deciding not to disturb the changed condition until receiving further guidance from the CO. As discussed above, the contract incorporated FAR 52.236–2, which instructed that Sergent was to "promptly, and *before the conditions are disturbed,* give a written notice to the Contracting Officer of ... subsurface or latent physical conditions at the site which differ materially from those indicated...." (Emphasis added.) In such a case, if the government is untimely in responding to the contractor's concerns, the contract does not specifically assign to the contractor the burden to bear the costs of the government's inaction.

In addition to the differing site condition clause, the contract also contained, as discussed earlier, a standard suspension of work clause based on FAR 52.212–12. To paraphrase, the suspension of work clause provides for an equitable adjustment for any period during which work is suspended, delayed or interrupted for an unreasonable amount of time. Adjustments are allowed under the clause only to the extent that a delay is caused by the government's action or inaction; to the extent a delay is caused by the fault or negligence of the contractor, no adjustment is warranted. Thus, in order to determine whether plaintiff prevails on its delay claims at LF–08, the court must decide whether the delay was the fault of the government or of the contractor and whether it was reasonable or unreasonable.

There is no dispute that the delay was initially caused by a differing site condition, of which the contractor notified the CO on July 18, 1990. Thus, the delay was not initially the fault of the contractor. Furthermore, case law has held that any delay is *per se* unreasonable for the purpose of applying the standard suspension clause if the delay is caused by a deficient specification in the contract. *Chaney and James Constr. Co. v. United States,* 190 Ct.Cl. 699, 705, 421 F.2d 728, 731 (1970); *Luria Bros. & Co. v. United States,* 177 Ct.Cl. 676, 690, 369 F.2d 701, 707–08 (1966); *Laburnum Constr. Corp. v. United States,* 163 Ct.Cl. 339, 349–50, 325 F.2d 451, 453–54 (1963). *See also Beauchamp Constr. Co., Inc. v. United States,* 14 Cl.Ct. 430, 438 (1988); *CCM Corp. v. United States,* 20 Cl.Ct. 649, 657–58 (1990). Although a defective specification is not, strictly speaking, identical to a differing site condition, the effect on performance is essentially the same. Moreover, *Luria Bros.* also suggests that, in the context of determining a contractor's entitlement to delay damages, a differing site condition is indeed analogous to a deficient specification:

> Ordinarily, defendant is entitled to make necessary changes, but where the change is necessitated by defective plans and specifications defendant must pay the entire resulting damage without any deduction for time to make changes, *as would be the case if the redesign were necessitated by a changed condition or the like.*

177 Ct.Cl. at 690, 369 F.2d at 709 (emphasis added) (citation omitted). The Veterans Affairs Board of Contract Appeals, citing *Beauchamp* and *CCM,* has applied this rule to delays arising in the context of a differing

---

**26.** In addition to the delays resulting from the "pregnant-U" channel, plaintiff also claims to have been delayed from August 20–21, 1990, and the damages from that delay appear to be subsumed into the other delay damages claimed for LF–08. On August 20, 1995, Sergent encountered a four-inch conduit that contained communications wires; the conduit was not identified on the contract documents and which could not be removed without guidance from the Air Force.

site condition in *Berrios Constr. Co.*, 92–2 B.C.A. (CCH) ¶ 24,828 (1992).

In the present case the salient facts are that the contractor discovered a differing site condition at a point when, the evidence establishes, no other substantial work at LF–08 was left to be completed. The Air Force provided no guidance as to what was expected under the circumstances of the changed site conditions. Accordingly, the government is liable for the delays preceding the date when Sergent, at its own risk, resumed work at the site.

On the basis of the preceding facts and case law, the court finds the government liable for plaintiff's delay damages in connection with work performed at LF–08. Based on the October 12, 1993, joint stipulation, plaintiff is entitled to an additional $17,833, with CDA interest to be computed from June 14, 1991.

### Claim 6

Sergent, after receipt of an NTP dated February 25, 1991, commenced work at site LF–EO. By mid-April 1991, Sergent was in the process of completing all work at that site when it discovered, during recompaction of fill, that the amount of imported fill needed to reach a compaction level of 95 percent—as specified in the contract—was substantially in excess of the amount the contractor had estimated based on the size of the tank that had been removed. Sergent sent a written notice to the CO on April 19, 1991, alleging a differing site condition in that the site, apparently, was not compacted to 95 percent before excavation was begun. It was necessary to import approximately 2,117 cubic yards of additional fill to meet the specification. By letter dated June 14, 1991, Sergent filed a certified claim seeking $47,867.36 for this unanticipated fill material. By letter dated August 28, 1991, the CO denied Sergent's request in its entirety.

Plaintiff contends that the lack of prior compaction to the 95 percent level was a Type II differing site condition because it constituted an unknown physical condition at the site, of an unusual nature, which differed materially from those ordinarily encountered

and generally inhering in work of the character provided for in the contract. Sergent argues that it could not have reasonably anticipated such a condition and, therefore, it should be compensated for the costs of its extra compaction efforts.

Defendant contends that Sergent's extra compaction effort was not due to lack of original compaction but due solely to excessive moisture at the site—a risk which plaintiff assumed under the contract. Therefore, defendant argues that plaintiff has failed to show that a Type II differing site condition actually caused the problem and that plaintiff should not recover any of its costs for additional fill materials.

 To prevail under a Type II differing site condition claim, a plaintiff must prove that it encountered a previously unknown physical condition at the site and that the condition encountered differed materially from what was generally recognized as inherent in the work of the character called for in the contract. *Servidone*, 19 Cl.Ct. at 360 (citations omitted). While Type II conditions can give rise to claims for equitable adjustments, added costs incurred due to acts of nature, such as heavy rains, are not usually recoverable under the standard differing site condition clause. *Turnkey Enter., Inc. v. United States*, 220 Ct.Cl. 179, 186–87, 597 F.2d 750, 754 (1979) (citations omitted).

 Although the evidence shows that no significant rains occurred during actual excavation, Mr. Drake testified that during March 1991 unusually heavy rains "turned the site into a lake," which made it difficult for Sergent to achieve 95 percent compaction. TR. 692. Mr. Thibeault's testimony also suggests that there was excess moisture at LF–EO. What is more important, however, is that Sergent submitted no evidence respecting the relative amounts of fill that were required at other sites or any convincing testimony to support its argument as to the cause of the problem. Each of the 16 sites required some fill material because of the cavity left by the extracted UST. But Sergent submitted no evidence respecting the compaction level at LF–EO prior to exca-

vation.[27] Its case for recovery is based upon an assumption that the compaction had to have been less than 95 percent before it began excavation because this is, logically, a possible cause. But it is not the sole possible cause. Moreover, there is insufficient evidence of record to convince the court that the compaction was *significantly* less than the 95 percent level prior to excavation—*i.e.*, beyond that degree of reasonable variance from the government's specification of 95 percent compaction to result in a finding of liability. Further, the court cannot find that additional moisture from heavy seasonal rains was not, at least, a contributing factor to the need for additional fill materials.

A fundamental problem confronting Sergent in proving a lack of compaction sufficient to support a Type II differing site condition claim is that after excavation, tank removal, replacement and compaction of all available extracted soils, it is much too late to take soil samples and do compaction studies which would permit the court to find that some discrete level of compaction (*i.e.*, less than 95 percent) existed prior to excavation. The only evidence of there having been some degree of compaction less than 95 percent is plaintiff's very general comparison, without any offer of specific comparative data, that at all other sites having the same size tank, when compared with the need for fill material at site LF–EO, the soil deficit was significantly greater at site LF–EO. However, without such data, the court must consider this claim unproven and, therefore, without merit. Accordingly, this claim is denied in its entirety.

### Claim 7

On May 10, 1991, pursuant to the contract, Sergent notified the Air Force that it would be ready to begin work at site LF–09 in 10 days. The Air Force responded that that site would not be available until May 28, 1991, which was not in accordance with the contract's requirement that the government make the site available within 10 days of the contractor's request. Sergent notified the

government of this apparent breach. Thereafter and until June 17, 1991, because of base operations and road closures, the government could not make the site available to Sergent. By letter dated June 7, 1991, Sergent again properly notified the government of the unavailability and followed this notice with a claim letter dated July 16, 1991, seeking delay costs of $13,053.

The CO issued a final decision allowing in part and denying in part Sergent's claim. The disputed portion of Sergent's claim concerns delays Sergent experienced on May 25, 26 and 27 and the period from June 3 through June 7, 1991. The CO denied the days in May on the grounds that they occurred during a three-day holiday weekend (Memorial Day) and denied the days in June on the grounds that the road closures which Sergent alleged as the basis of its June delay claims did not actually occur.

■ "[I]t is ... an implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." *George A. Fuller Co. v. United States*, 108 Ct.Cl. 70, 94, 69 F.Supp. 409, 411 (1947); *see also Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 700, 1964 WL 8611 (1964); *Delta Equip. & Constr. Co. v. United States*, 125 Ct.Cl. 632, 634, 113 F.Supp. 459, 460–61 (1953); *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26, 30 (1977). The contract's suspension of work clause, above, also requires that the contractor be compensated for unreasonable delays caused by the government.

■ With respect to the May delays, Sergent argues that it is entitled to compensation for those days notwithstanding that they occurred during a three-day weekend because its bid costs were based on calendar days, not working days. Furthermore, other time provisions under the contract are based on calendar days and do not exclude week-

27. Furthermore, as defendant points out, the contract documents did not make any representations as to what the compaction level of any

site was prior to excavation. Lacking such a representation, plaintiff would also fail to prove a Type I differing site condition.

ends or holidays. Generally speaking, the contract requires the contractor to complete each project within a certain number of calendar days, thus implicitly *requiring* the contractor to work on weekends and holidays— without additional compensation—if necessary to complete a project within the period set forth in the contract. Accordingly, the CO's denial of Sergent's delay claims for the May dates does not appear to be supported by the contract; the court finds in plaintiff's favor with respect to those dates.

As for the June 3–7 delay, there is apparently no dispute that Sergent was not allowed access to LF–09 on the days claimed. At trial, the only dispute appeared to be over the *cause* of that denial of access, but the only party that presented evidence at trial indicating why LF–09 was unavailable for those five days in June was plaintiff. Sergent presented contemporaneous contractor's daily reports which stated that the contractor was unable to enter the LF–09 site due to unscheduled road closures. In its post-trial brief, defendant appears to concede that the delays that occurred on June 3–7 were caused by road closures by the Air Force, but argues that plaintiff should not recover because the contractor failed to prove that the delay was unreasonable. However, based on the evidence that the roads were indeed closed on the five days in question, the court is satisfied that delays on those days were solely the responsibility of the government. Defendant, likewise, has failed to satisfactorily explain why the site was not made available to the contractor within the 10–day contract period and why the site was still not available for more than two additional weeks. The preponderance of evidence indicates that the delay experienced by Sergent from June 3 through June 7 was unreasonable. Accordingly, the court finds in plaintiff's favor with respect to those dates.

Based on the October 12, 1993, joint stipulation, Sergent is entitled to an additional $13,053 with respect to Claim 7, with CDA interest to be computed from July 16, 1991.

### Claims 8.A, 8.B and 8.C

Claim 8.A concerned additional work and delays incurred by plaintiff at site LCF–01A. The only part of Claim 8.A which remains in contention concerns alleged delays for which Sergent sought, but was denied, compensation.

The Air Force issued an NTP with respect to LCF–01A on Friday, July 26, 1991, with directions to begin work on July 29. On July 29, however, the contract surveillance inspector did not allow the contractor to begin work because the site was not yet ready to be excavated. Prior to beginning any excavation, the parties had agreed that technical personnel would identify and mark communication lines so that the contractor's crew would not disturb them; the contractor was obligated to forbear earth-moving until the lines were identified. By July 29, the communication lines were still not marked.

Sergent eventually proceeded to attempt to drain the fuel from the UST (the first step in each of the UST-removal projects) using a siphoning method which did not require disturbing the earth or the concrete structures protecting the tank. Sergent's siphoning method took considerably more time than would have been necessary if the contractor had been allowed to disturb a concrete structure over the tank. Under the circumstance of not yet knowing where the communication lines lay buried, the more efficient drainage method was not possible. Consequently, the contractor had to incur additional costs to keep leased equipment longer and to lodge personnel overnight.

The CO's decision, issued more than a year later, explained that the communication lines were not marked by July 29 because Sergent's project manager, Mr. Thibeault, had not given the base's communications personnel enough notice.[28] The court finds that

---

28. The CO's final decision denying delay costs for Claim 8.A, also appears to be based on Mr. Eversole's belief that July 29 and 30 were weekend days. Consequently, Mr. Eversole stated in his final decision, "The Government did not request your work crews to work over the weekend nor does the Government recognize any delay costs on 29 July or 30 July 91." However, July 29 and 30, 1991, were Monday and Tuesday, so to the extent that Mr. Eversole's denial of delay costs was based on the belief that the 29th and

explanation unpersuasive. As discussed earlier, the contract required Sergent to give the Air Force at least 10 days notice before beginning work at a particular site. The purpose of that notice requirement was obviously to give the Air Force ample time to prepare a site for excavation. There is no allegation by defendant or any other indication in the record suggesting that Sergent failed to meet its notice requirements with respect to LCF–01A. Consequently, the Air Force's failure to mark the communication lines at LCF–01A until more than two days after the date on which the CO instructed Sergent to begin work on that site was unreasonable. Defendant, therefore, is liable for the added costs which were necessarily incurred on July 29 and 30, 1991, due to the Air Force's failure to mark the communication lines.

■■■ Claim 8.B concerned a work stoppage which the Air Force ordered at LCF–01A from August 2 through August 6, 1991, after the UST at that site had been removed. Under the contract, Sergent could not backfill the excavated area until certain steps had been taken to ensure that diesel fuel from the UST had not contaminated the surrounding soil.[29] Specifically, Sergent was required to have a certified lab technician obtain soil samples from the site and run a battery of tests on them. If the soil passed those tests, then the County of Santa Barbara would issue a permit approving the backfilling of the site.

Sergent took all of the steps described above and obtained a permit from the county to backfill. The Air Force's environmental officers, however, were not convinced that the soil was not contaminated. As a result, the contractor was not permitted to backfill the site until after base environmental personnel could take their own samples and satisfy themselves that the soil was uncontaminated. When considering Sergent's claim for delay costs, Mr. Eversole disallowed all

but 1.5 days of claimed delays "due to the Government delay on evaluating the site for diesel fuel contamination."[30] Sergent was not compensated for the delay period preceding the Air Force's taking of soil samples, including the samples and testing previously done to obtain the county permit.

The CO's final decision suggests that testing by base environmental personnel was necessary because Mr. Thibeault inappropriately "decided to deal directly with the County of Santa Barbara Office and not the Base Environmental Office." Mr. Eversole's position, however, is without merit. Sergent took all reasonable and required steps under the contract to ensure that the soil was not contaminated prior to backfilling LCF–01A. The Air Force's running of its own battery of tests was redundant and was not called for under the contract. Even on the witness stand, the court notes that Mr. Eversole *admitted* that Sergent was not required under the contract to consult with the base environmental office prior to contacting county officials for backfill approval. Mr. Eversole further admitted that the contract allowed Sergent to employ a private laboratory to evaluate soil samples and did not require the contractor to use the base environmental office's laboratories. Tr. 667–68. Consequently, any confusion which arose from Sergent's having proceeded as it did was solely the responsibility of the government. With respect to Claim 8.B, therefore, plaintiff must prevail.

Claim 8.C concerned additional work which was required to remove a UST at site LF–03. The CO granted about half the amount claimed and denied the rest. Apart from Sergent's certified claim and the CO's final decision, plaintiff did not introduce any evidence at trial to enable the court to determine the correctness of Mr. Eversole's decision. Nothing on its face, moreover, suggests that Mr. Eversole's decision with respect to Claim 8.C was wrong. Accord-

---

30th were Saturday and Sunday, that denial is unfounded.

**29.** Apparently, soil tests were taken at each site, but LCF–01A was the only one in which a work-stoppage was ordered by the Air Force for that purpose.

**30.** The court is uncertain as to the basis for the "1.5 days" of delay to which Mr. Eversole's final decision refers; the record shows that the Air Force's round of tests took 72 hours to complete, not 36 hours.

ingly, the preponderance of evidence with respect to Claim 8.C does not weigh in plaintiff's favor. Claim 8.C fails for lack of proof.

Based on the October 12, 1993, joint stipulation, Sergent is entitled to an additional $4,621, with DCA interest to be computed from September 13, 1991.[31]

### Claim 9

The outstanding dispute regarding plaintiff's claim for delay costs associated with site LF–DO is virtually identical to the dispute regarding Claim 7, discussed above. The parties agree that plaintiff is entitled to be compensated for delay costs, but they disagree over whether the compensable days of delay should include weekends. As with LF–09, Mr. Eversole denied the portion of Claim 9 which included compensation for weekend delays.

For the same reasons set forth in the court's discussion of Claim 7, the court agrees with plaintiff that weekend delays are compensable under the present contract. Accordingly, the court holds for the plaintiff with respect to Claim 9. Based on the joint stipulation, Sergent is entitled to an additional $3,778, with CDA interest to be computed from December 2, 1991.

### CONCLUSION

To summarize, after careful consideration of the oral testimony, exhibits, arguments and the applicable law, the court has reached the following conclusions with respect to each outstanding claim:

Claims 1.A and 1.B: Plaintiff prevails. Sergent is entitled to $392,635, with CDA interest to accrue from April 16, 1991.

Claim 1.C: Plaintiff prevails. Sergent is entitled to $1,706, with CDA interest to accrue from April 16, 1991.

Claim 1.F: Plaintiff prevails. Sergent is entitled to $11,757, with CDA interest to accrue from April 16, 1991.

Claim 1.H: Defendant prevails. The claim is dismissed.

Claim 4: Plaintiff prevails. Sergent is entitled to $17,833, with CDA interest to accrue from June 14, 1991.

Claim 6: Defendant prevails. The claim is dismissed.

Claim 7: Plaintiff prevails. Sergent is entitled to $13,053, with CDA interest to accrue from July 16, 1991.

Claims 8.A and 8.B: Plaintiff prevails. Sergent is entitled to $4,621, with CDA interest to accrue from September 13, 1991.

Claim 8.C: Defendant prevails. The claim is dismissed.

Claim 9: Plaintiff prevails. Sergent is entitled to $3,778, with CDA interest to accrue from December 2, 1991.

The court notes, in addition, that the parties have jointly stipulated to the entry of judgment in favor of plaintiffs for $57,274 with respect to Claims 2, 3, 10 and 11, with CDA interest to accrue from November 15, 1991. Plaintiff withdrew Claims 1.D, 1.E, 1.G and 5; accordingly, those claims are now dismissed.

The clerk shall enter judgment as set forth above. Each party shall bear its own costs.

IT IS SO ORDERED.

---

31. The joint stipulation set the amount of damages for all of Claim 8 at $6,613 but did not break that figure down to account for the three subordinate and severable claims set forth in Claim 8. The court has accepted the stipulated amount but adjusted it downward to reflect plaintiff's failure of proof as to Claim 8.C.